1

2

3

4                          UNITED STATES DISTRICT COURT

5                         NORTHERN DISTRICT OF CALIFORNIA

6

7

8    DON COPELAND, et al.,                    Case No.  23-cv-02087-PCP

9                    Plaintiffs,

10          v.

11   ENERGIZER HOLDINGS, INC., et al.,

12                   Defendants.

13   PORTABLE POWER, INC.,                     Case No.  23-cv-02091-PCP

14                   Plaintiff,

15          v.

16   ENERGIZER HOLDINGS, INC., et al.,

17                   Defendants.

18   KIMBERLY SCHUMAN, et al.,                 Case No.  23-cv-02093-PCP

19                   Plaintiffs,

20          v.

21   ENERGIZER HOLDING, INC., et al.,

22                   Defendants.

23

24                    **ORDER DENYING MOTIONS TO DISMISS**

25          In these related antitrust cases, three putative classes of plaintiffs allege that defendant

26   Energizer Holdings, Inc. agreed to give defendant Wal-Mart, Inc. control over the retail prices of

27   Energizer products everywhere the products are sold. Plaintiffs claim this violated Section 1 of the

28   Sherman Act and a host of state laws. Defendants move to dismiss these claims. They argue that

1  plaintiffs have not adequately pleaded that Energizer and Walmart entered such an agreement, and

2  that even if they had, the complaint does not allege that the agreement harmed competition in a

3  manner that violates the Sherman Act or the identified state laws. They also challenge plaintiffs'

4  standing. Defendants' motions are denied for the reasons that follow.

5  **I.    Background**

6          The facts that follow are alleged in plaintiffs' complaints and accepted as true for purposes

7  of defendants' Rule 12(b)(6) motion.[1]

8          Energizer and Duracell are the two main manufacturers of disposable batteries in the

9  United States. Together they account for 85% of U.S. battery sales. Energizer alone accounts for

10  over half of U.S. battery sales. The market for disposable batteries is hard to enter because of the

11  critical minerals (cobalt, lithium, graphite) and hazardous materials (lead, mercury) used to make

12  batteries, and because of significant ad spending by Energizer and Duracell. Demand is decreasing

13  for many reasons ranging from the rise of smartphones to environmental concerns. Energizer also

14  sells lighting products like headlights that use disposable batteries.

15          Walmart is the world's largest company by revenue. It operates thousands of retail stores

16  in the United States. It is a major retailer of batteries. In 2012, Walmart purchases accounted for

17  20% of Energizer's overall sales. Until 2013, Energizer had an exclusive contract to supply

18  batteries to Sam's Club, Walmart's discount warehouse chain. Energizer lost that contract in 2013,

19  however, and Walmart's share of Energizer's sales dropped to 13.3% that year and to 8.5% by

20  2014. From then until 2021, Walmart's share of Energizer's sales stayed below 15%.

21          Plaintiffs allege that as early as January 2018, Walmart and Energizer entered into a new

22  agreement pursuant to which Walmart would give Energizer preferential treatment at its stores

23  while Energizer would monitor Walmart's competitors to keep them from undercutting Walmart's

24  retail prices for Energizer batteries and, if necessary, increase wholesale prices charged to the

25  competitors. Energizer created a group called Project Atlas to monitor retail prices and ensure that

26

27  _____

28  [1] Defendants filed a single motion to dismiss directed at all three complaints in these actions. Like
    defendants, the Court cites to the *Copeland* complaint and briefing except where indicated.

United States District Court
Northern District of California

its distributers would not undercut Walmart. By April 2018, Energizer had increased prices by over 8% from the previous year. Plaintiffs allege that the agreement remains in effect.

Portable Power is an online battery retailer that tried to undercut Walmart's prices for Energizer batteries. One place it sells these products is Amazon's online third-party marketplace.

Plaintiffs allege that Walmart complained to Energizer about "disruptive pricing" on online marketplaces and asked Energizer what it was doing to "resolve" the issue. In response, in November 2018, Energizer raised Portable Power's wholesale prices by 50–85% for certain products. Energizer's sales representative told Portable Power that it was raising prices to align Portable Power with Energizer's pricing policy. Later, in January 2021, the same sales representative forwarded to Portable Power's CEO an email from Energizer's Project Atlas team. The email identified portable Power as one of the top-ten Amazon sellers "in violation" of Energizer's "pricing policies." The email included this chart listing the top ten violators:

| # | SELLER | STATUS | VIOLATIONS | AVG % | ALEXA | RATINGS | LAST ACTION | DATE |
|---|--------|--------|------------|-------|-------|---------|-------------|------|
| | Top Amazon Sellers in Violation for December 2020 | | | | | | | |
| 1 | amazon.com | Authorized [amazon | 274 | -13.6% | 10 | N/A | New | --- |
| 2 | bestdealsupply.com | Unauthorized Indire | 127 | -19.0% | NA | N/A | Escalated Enforcement - New | 08/01/20 |
| 3 | MYBATTERYSUPPLIER [Amazon US] | Unauthorized Indire | 109 | -11.6% | NA | 379910 | Escalated Enforcement - New | 08/01/20 |
| 4 | National Deals [Amazon US] | Unauthorized Indire | 68 | -22.1% | NA | 85184 | Letter Sent - New | 12/15/20 |
| 5 | Another Day in ParadisePCB [Amazon US] | Unauthorized Indire | 34 | -12.8% | NA | 2294 | New | --- |
| 6 | Tzohar Inc [Amazon US] | Unauthorized Indire | 31 | -15.9% | NA | 1257 | Letter Sent - New | 11/20/20 |
| 7 | Quiver [Amazon US] | Authorized | 17 | -24.6% | NA | 85647 | New | --- |
| 8 | JustCalculators [Amazon US] | Unauthorized Indire | 14 | -39.8% | NA | 46232 | Letter Sent - New | 10/20/20 |
| 9 | 718 Sold It [Amazon US] | Unauthorized Indire | 14 | -7.6% | NA | 6347 | Letter Sent - New | 12/14/20 |
| 10 | HB Wholesale [Amazon US] | Unauthorized Direc | 10 | -26.5% | NA | 48175 | New | --- |

Plaintiffs allege that this chart shows that Energizer had a system for monitoring and disciplining retailers, including by sending letters and escalating enforcement. In an internal email accompanying the chart, an Energizer manager asked the sales representative to "see the latest situation" on Portable Power and to "see if he's willing [to] revise his pricing and get him off the radar" "[b]efore we shut them off on these sku's." Compl. at 18.

On February 1, 2021, the sales representative told Portable Power that Energizer would stop shipping certain products to Portable Power because it had not raised its retail prices to match

3

Walmart's. The sales representative told Portable Power's CEO, "This is 1000% about Walmart and wanting the best price." On February 16, 2021, the sales representative quoted wholesale prices to Portable Power for a different product. She emailed Portable Power asking, "If the items are priced to match the Walmart selling price minus 20% would that work for you?" Her email also included a chart plaintiffs say shows how the prices offered to Portable Power were determined based on Walmart's retail prices:

| Rayovac Part | Description | List | Case Qty | Matrix cost | Walmart selling price | Seller | 20% | Walmart selling price minus 20% |
|---|---|---|---|---|---|---|---|---|
| 10-16 | RAYOVAC RETAIL SIZE 10 16PK | | 24 | $8.80 | $10.81 | Walmart direct | $2.16 | $8.65 |
| 10-24 | RAYOVAC RETAIL SIZE 10 24PK | | 24 | $12.72 | $18.76 | Walmart direct | $3.75 | $15.01 |
| 10-48 | RAYOVAC RETAIL SIZE 10 48PK | | 6 | $24.48 | $29.75 | Local Battery | $5.95 | $23.80 |
| 10-8 | RAYOVAC RETAIL SIZE 10 8PK | | 24 | $4.56 | $4.99 | Walmart direct | $1.00 | $3.99 |
| 13-16 | RAYOVAC RETAIL SIZE 13 16PK | | 24 | $7.68 | $7.49 | Walmart direct | $1.50 | $5.99 |
| 13-24 | RAYOVAC RETAIL SIZE 13 24PK | | 24 | $10.80 | $9.79 | Walmart direct | $1.96 | $7.83 |
| 13-48 | RAYOVAC RETAIL SIZE 13 48PK | | 6 | $18.72 | $17.99 | DZEE Suppliers | $3.60 | $14.39 |
| 13-8 | RAYOVAC RETAIL SIZE 13 8PK | | 24 | $3.76 | $6.87 | Walmart direct | $1.37 | $5.50 |
| 312-16 | RAYOVAC RETAIL SIZE 312 16PK | | 24 | $7.68 | $7.49 | Walmart direct | $1.50 | $5.99 |
| 312-24 | RAYOVAC RETAIL SIZE 312 24PK | | 24 | $11.04 | $9.79 | Walmart direct | $1.96 | $7.83 |
| 312-48 | RAYOVAC RETAIL SIZE 312 48PK | | 6 | $21.12 | $16.89 | Walmart direct | $3.38 | $13.51 |
| 312-6 | RAYOVAC RETAIL SIZE 312 6PK | | 24 | $3.12 | $5.87 | Walmart direct | $1.17 | $4.70 |
| 312-8 | RAYOVAC RETAIL SIZE 312 8PK | | 24 | $4.00 | $6.87 | Walmart direct | $1.37 | $5.50 |
| 13-6 | Not in bid tool | $4.86 | | | $5.87 | Walmart direct | $1.17 | $4.70 |
| 13-32 | Not in bid tool | $18.88 | | | $16.97 | Walmart direct | $3.39 | $13.58 |

Plaintiffs allege that the wholesale prices offered to Portable Power in the chart were set at 20% below Walmart's retail price so that Portable Power could match Walmart's retail prices and still retain a sufficient markup.

Plaintiffs allege that the agreement between Energizer and Walmart resulted in an overall increase in the retail price for Energizer's batteries that began in 2018. By April 2018, prices had increased by 8% from the year before. Throughout 2019, 2020, and 2021, Energizer continued to roll out additional wholesale price increases: 8% for certain batteries in mid-2019, 10% for all products in late 2020, 10% for the "MAX" line of batteries in April 2021, and 11% for all household batteries in June 2021. Walmart, too, increased its retail prices for Energizer products: a 20% jump for some products in late 2019 and another 40% jump in early 2020. For example,

4

1    Walmart's retail price for 24 Energizer Max Alkaline AAA batteries rose from $12.78 in May

2    2019 to $16.24 by July 2019, and stayed around that level for the following twelve months.

3    Plaintiffs argue that the scheme benefited Energizer because it was able to enjoy inflated

4    wholesale prices and preferential treatment at Walmart stores. And they argue that it benefited

5    Walmart because it was able to inflate its retail prices for Energizer products without being

6    undercut by other sellers. They also argue that Walmart charged similarly inflated prices for

7    Duracell products at its stores, thus eliminating Duracell's largest opportunity to compete.

8    Three sets of plaintiffs filed putative class actions against Walmart and Energizer. The

9    first, the *Copeland* plaintiffs, are customers who purchased Energizer products from retailers other

10    than Walmart.[2] The second, the *Schuman* plaintiffs, are customers who purchased Energizer or

11    Duracell battery products directly from Walmart stores.[3] The third, Portable Power, proposes a

12    class of retailers (or anyone) who purchased Energizer products directly from Energizer.[4] The

13    Court related the actions under Local Rule 3-12. Defendants have moved to dismiss all three

14    complaints.

---

[2] The *Copeland* plaintiffs propose the following class definition: "All persons and entities in Repealer Jurisdictions who indirectly [and not from Walmart] purchased Energizer Battery Products for their own use and not for resale, at any time during the period from January 1, 2018 until the anticompetitive effects of Defendants' challenged conduct cease." Compl. at 24.

[3] The *Schuman* plaintiffs propose two classes: a California class consisting of "[a]ll persons who purchased Energizer or Duracell Battery Products directly from a Walmart brick-and-mortar store in California from January 1, 2018 until the anticompetitive effects of Defendants' challenged conduct cease, and who did not use the Walmart Plus Program when making their purchases," and a national class consisting of "[a]ll persons who purchased Energizer or Duracell Battery Products, directly from a Walmart brick-and-mortar store in the United States from January 1, 2018 until the anticompetitive effects of Defendants' challenged conduct cease, and who did not use the Walmart Plus Program when making their purchases." *Schuman* Compl. at 24.

[4] Portable Power proposes two classes: a California class consisting of "[a]ll persons and entities that purchased Energizer Battery Products directly from Energizer in California from January 1, 2018 until the anticompetitive effects of Defendants' challenged conduct cease," and a national class consisting of "[a]ll persons and entities that purchased Energizer Battery Products directly from Energizer in the United States from January 1, 2018 until the anticompetitive effects of Defendants' challenged conduct cease." *Portable Power* Compl. at 23.

## II.    Legal Standards

Federal Rule of Civil Procedure 8 requires a "short and plain statement of the claim showing that the pleader is entitled to relief," with allegations that are "simple, concise, and direct." The purpose is twofold. The complaint must "plausibly suggest" the plaintiff's entitlement to relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 681 (2009). It must also give "fair notice" and "enable" the defendant "to defend itself effectively." *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011).

A complaint that does not state a claim upon which relief can be granted can be dismissed under Rule 12(b)(6). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable." *Iqbal*, 556 U.S. at 678. Legal conclusions "can provide the framework of a complaint" but must be "supported by factual allegations." *Id.* at 664. The Court must "accept all factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party." *Rowe v. Educ. Credit Mgmt. Corp.*, 559 F.3d 1028, 1029–30 (9th Cir. 2009).

## III.    Analysis

### A.    Plaintiffs Have Adequately Pleaded a Violation of the Sherman Act.

Section 1 of the Sherman Act declares "[e]very contract, combination…, or conspiracy, in restraint of trade or commerce … to be illegal." 15 U.S.C. § 1. "Courts have long read Section 1 to outlaw only unreasonable restraints. Thus, a Section 1 inquiry has both a threshold component (whether there is a contract, combination, or conspiracy) and a merits component (whether it is unreasonable)." *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 981 (9th Cir. 2023) (cleaned up). Defendants argue that plaintiffs have failed to plead facts establishing either an agreement (as opposed to unilateral conduct) or that the alleged agreement is unreasonable. They also challenge certain plaintiffs' standing to pursue their Sherman Act claims.

#### 1.    Plaintiffs Plausibly Allege that Defendants Had an Agreement.

To state a Section 1 claim, plaintiffs must plausibly allege an agreement between Energizer and Walmart. "A formal agreement is not necessary," simply "a conscious commitment to a common scheme designed to achieve an unlawful objective." *PLS.Com, LLC v. Nat'l Ass'n of Realtors*, 32 F.4th 824, 842 (9th Cir. 2022) (cleaned up). But "[u]nilateral conduct by a single

6

firm, even if it appears to restrain trade unreasonably, is not unlawful under section 1." *The Jeanery, Inc. v. James Jeans, Inc.*, 849 F.2d 1148, 1152 (9th Cir. 1988) (cleaned up). An unlawful agreement can be shown by "direct evidence." *In re Musical Instruments & Equip. Antitrust Litig.,* 798 F.3d 1186, 1193 (9th Cir. 2015). Alternatively, plaintiffs can plead "evidentiary facts" that "provide a plausible basis" to "infer the alleged agreements' existence." *Id.* at 1193, 1194 n.6.

Here, the contours of the agreement plaintiffs ask the Court to infer existed between Energizer and Walmart are simple: In exchange for preferential treatment at Walmart stores, Energizer would charge wholesale prices that would keep other retailers from undercutting Walmart. Plaintiffs do not offer direct evidence of this alleged agreement. Accordingly, the Court must determine whether the evidentiary facts in the complaint "provide a plausible basis" to "infer the alleged agreement['s] existence." *Musical Instruments,* 798 F.3d at 1193, 1194 n.6.

The first question is what level of factual detail Rule 8 requires in order for the Court to infer an agreement under Section 1. Defendants suggest that the Ninth Circuit's decision in *Kendall v. Visa U.S.A., Inc.* requires plaintiffs to specifically plead "who, did what, to whom (or with whom), where, and when." Reply at 10 (quoting *Kendall*, 518 F.3d 1042, 1049 (2008)). On this basis, they fault plaintiffs for, among other things, failing to identify the specific Walmart and Energizer employees who entered the agreement or where the agreement was formed. *Id.*

But *Kendall* does not establish a heightened pleading standard applicable only to antitrust conspiracy cases. Nor could it: The Supreme Court has repeatedly recognized that the same Rule 8 standard applies to antitrust and non-antitrust cases alike. *See Iqbal*, 556 U.S. at 677–80; *Johnson v. City of Shelby*, 574 U.S. 10, 12 (2014). *Kendall* affirmed dismissal of a Section 1 claim because the complaint "failed to plead evidentiary facts sufficient to establish a conspiracy." 518 F.3d at 1045. In explaining that the complaint included "no alleged facts" to support its conclusion, the Ninth Circuit emphasized that "the complaint does not answer the basic questions: who, did what, to whom (or with whom), where, and when?" *Id.* at 1048. But the Ninth Circuit's rejection of a complaint that pleaded *no* evidentiary facts and answered *none* of these questions does not mean that antitrust plaintiffs must answer *all* of these questions to state a claim. While such allegations would of course be relevant, at the pleading stage the plaintiffs need not allege every possible

1    detail about an agreement in order to raise a reasonable inference that one exists. *See also Musical*

2    *Instruments*, 798 F.3d at 1194 n.7 (explaining that "circumstantial evidence" can "support the

3    reasonable inference of an agreement" and "take a complaint from merely possible to plausible").

4    So what does Rule 8 require? Stating a Section 1 claim "requires a complaint with enough

5    factual matter (taken as true) to suggest that an agreement was made." *Bell Atl. Corp. v. Twombly*,

6    550 U.S. 544, 556 (2007). "Asking for plausible grounds to infer an agreement does not impose a

7    probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable

8    expectation that discovery will reveal evidence of illegal agreement." *Id*. "The crucial question is

9    whether the challenged anticompetitive conduct stems from independent decision or from an

10   agreement." *Id.* at 553 (cleaned up).

11   Determining whether a particular action is the result of an agreement or an independent

12   decision requires the Court to consider the plausibility of various potential explanations. In

13   *Kendall*, the Ninth Circuit explained that "facts that could just as easily suggest rational, legal

14   business behavior by the defendants as they could suggest an illegal conspiracy are insufficient to

15   plead a violation of the antitrust laws." 518 F.3d at 1049. But context is crucial. Many Section 1

16   cases—including *Kendall*, *Twombly*, and others cited by defendants—involve parallel conduct by

17   *competitors*. Competitors inherently face similar incentives, and "[e]ven conscious parallelism, a

18   common reaction of firms in a concentrated market that recognize their shared economic interests

19   and their interdependence with respect to price and output decisions, is not in itself unlawful."

20   *Twombly*, 550 U.S. at 553–54 (cleaned up). As a result, when plaintiffs claim horizontal

21   conspiracy based on nothing more than parallel conduct, there is an obvious alternative

22   explanation that the defendants were merely "reacting to the same market pressures and taking

23   parallel action to serve their interests." *See In re DRAM Indirect Purchaser Antitrust Litigation*, 28

24   F.4th 42, 53 (9th Cir. 2022). When a court considers whether such allegations "could just as easily

25   suggest rational, legal business behavior … as they could suggest an illegal conspiracy," *Kendall*,

26   518 F.3d at 1049, this obvious alternative explanation tips the scales in favor of finding rational,

27   independent behavior.

28

1    But the evidentiary showing needed to raise a reasonable inference of conspiracy will be

2    different where (as here) the alleged conspirators are not competitors. Without the obvious

3    alternative explanation that alleged conspirators were independently responding to the same

4    incentives, it will be easier to show that actions more easily suggest conspiracy than rational

5    independent behavior.

6    With these pleading standards in mind, the Court considers plaintiffs' allegations. Plaintiffs

7    essentially claim that Energizer let Walmart control the minimum retail prices for Energizer

8    products at *all* retailers. The complaints include Energizer documents showing that Energizer

9    calculated at least some wholesale prices based directly on Walmart's retail prices, allegedly

10    aiming to ensure that retailers would ultimately match Walmart's retail prices. *See* Compl. at 19,

11    Fig. 2. Does this suggest rational independent business behavior, or does it suggest an agreement?

12    Defendants point out that many of Energizer's alleged actions are not inherently

13    impermissible because "businesses are free to choose the parties with whom they will deal, as well

14    as the prices, terms, and conditions of that dealing." *Pac. Bell Tel. Co. v. LinkLine Commc'ns,*

15    *Inc.*, 555 U.S. 438, 448 (2009). This freedom includes the right to set minimum retail prices and

16    rein in discounters: A "manufacturer has every right to set the price at which it wants its goods

17    resold and to terminate a dealer who undercuts that price." *The Jeanery*, 849 F.2d at 1159. But

18    defendants' argument misses the point. The question is not whether Energizer's actions would be

19    legal if taken independently. The question is whether the actions support an inference that

20    Energizer was acting in accordance with an agreement. If they do, then that suffices to state a

21    claim, because the agreement itself can be illegal even if the actions taken to implement it

22    otherwise would not be. It is not enough for defendants to argue that Energizer *could* have legally

23    taken the alleged actions on its own; to defeat the plausible inference of an agreement, defendants

24    must show why Energizer *would* have taken those actions absent an agreement, and why this

25    explanation is stronger.

26    The Court concludes that Energizer's alleged actions are more suggestive of an agreement

27    than rational independent business behavior. If Energizer was independently pursuing its own

28    interests, then for any given wholesale price, Energizer would generally be motivated to *minimize*

United States District Court
Northern District of California

the ultimate retail prices—thereby maximizing sales and ultimately its profits. Even if Energizer decided it wanted to raise wholesale prices, the straightforward incentive would still be to keep retail prices low to drive sales. Of course, a manufacturer might decide that it is in their interest to set a uniform minimum retail price across all retailers. Such policies can help prevent intrabrand competition among different sellers, for example. But even if Energizer did want to prevent intrabrand competition among its retailers (which itself seems unlikely), preventing intrabrand competition does not explain why Energizer would allow *Walmart* to set those minimum prices instead of setting them itself. Indeed, Energizer allegedly told distributors that its pricing policies did not reflect its own business interests but were instead "1000% about Walmart." Compl. at 18.

It is of course *possible* that Energizer acted independently: Walmart is a major customer, and Energizer may have thought that responding aggressively to Walmart's complaints about price competition would result in better treatment from Walmart. *See, e.g.*, *The Jeanery*, 849 F.2d at 1154–55 (noting that competitors' complaints about price-cutters have "probative value" but are insufficient without "something more" to establish concerted action because complaints can be "natural … reactions by distributors to the activities of their rivals"). But at the pleading stage, plaintiffs need not disprove all other explanations. They simply need to provide "plausible grounds to infer an agreement." *Twombly*, 550 U.S. at 556. Even if it is conceivable that Energizer might accept negative consequences because it expected benefits from a major customer, the more plausible inference is that the two businesses had a shared understanding of the mutual benefits their coordinated conduct would create.

Here, plaintiffs have alleged that Energizer and Walmart had an agreement. They have pleaded facts showing how both Energizer and Walmart stood to benefit from the alleged agreement. They have outlined actions by Energizer and Walmart that are clearly consistent with the alleged agreement. And they have suggested multiple ways in which Energizer's conduct would be inconsistent with its own interests absent the alleged agreement.[5] Taken together, these

---

[5] Plaintiffs do not need to specifically plead that Energizer acted *against* its self-interest, as defendants argue. *See* Reply at 14. Rather, they must simply plead facts that are more plausibly explained by an agreement than by rational, economically self-interested behavior.

nonconclusory allegations place Energizer's conduct "in a context that raises a suggestion of a preceding agreement." *Musical Instruments*, 798 F.3d at 1194. The allegations appear more consistent with an agreement than with rational business decisions by Energizer. *See Kendall*, 518 F.3d at 1049. They provide a plausible basis for the Court to reasonably infer that the agreement existed and therefore sufficiently allege an agreement for purposes of plaintiffs' Section 1 claim.

### 2.    Plaintiffs Plausibly Allege that the Agreement Is Unreasonable.

"Section 1 … has been interpreted as outlawing only unreasonable restraints of trade." *In re Nat'l Football League's Sunday Ticket Antitrust Litig.*, 933 F.3d 1136, 1149 (9th Cir. 2019) (cleaned up). Courts generally "determine whether a particular restraint of trade is unreasonable and thus a violation of Section 1 under the so-called 'rule of reason.'" *Id.* at 1150. But "[a] small group of restraints are unreasonable *per se* because they always or almost always tend to restrict competition and decrease output." *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2283–84 (2018) (cleaned up).

"Typically only 'horizontal' restraints—restraints imposed by agreement between competitors—qualify as unreasonable *per se*." *Id.* Plaintiffs do not allege such a restraint, and instead focus on an alleged vertical agreement—one between entities "up and down a supply chain, such as between a manufacturer and a retailer." *Musical Instruments*, 798 F.3d at 1191. Their claims are therefore "analyzed under the rule of reason." *Id.*[6]

Courts analyze rule of reason claims with a burden-shifting framework that has three steps. First, the plaintiff must "prove that the challenged restraint has a substantial anticompetitive effect that harms consumers in the relevant market." *PLS.Com*, 32 F.4th at 834 (quoting *Amex*, 138 S. Ct. at 2284). Next, the defendant must "show a procompetitive rationale for the restraint." *Id.* "If the defendant makes this showing, then the burden shifts back to the plaintiff to demonstrate that the procompetitive efficiencies could be reasonably achieved through less anticompetitive means." *Id.*

---

[6] Plaintiffs briefly invoke the per se rule by arguing that Walmart, as a retailer, "competed directly and horizontally with Energizer by offering its own private label brand of disposable batteries." Compl. at 30. This conclusory allegation, however, is not accompanied with any evidentiary facts demonstrating such competition. The complaints contain no allegation that Walmart manufactured and wholesaled private label batteries, for example, or that Energizer sells batteries at retail.

United States District Court
Northern District of California

United States District Court
Northern District of California

1   At the pleading stage, plaintiffs need only clear the first hurdle and plausibly allege that the

2   restraint substantially impairs competition in the relevant market in a way that harms consumers. A

3   "threshold step … is to accurately define the relevant market." *FTC v. Qualcomm Inc.*, 969 F.3d

4   974, 992 (9th Cir. 2020). The plaintiff must then plead facts showing substantial harm to competition

5   in that market. "A plaintiff can establish a substantial anticompetitive effect for purposes of the first

6   step of the rule of reason analysis either directly or indirectly." *PLS.Com*, 32 F.4th at 824.

7               **a.      Relevant Market**

8   Because plaintiffs allege a vertical restraint, they must define the relevant market

9   regardless of whether they attempt to establish anticompetitive effects through direct or indirect

10  proof. *See Amex*, 138 S. Ct. at 2285 n.7; *cf. PLS.Com*, 32 F.4th at 838 & n.7 ("A plaintiff is not

11  required to define a particular market … for a rule of reason claim based on evidence of the actual

12  anticompetitive impact of [a] … horizontal restraint.").

13  "A relevant market contains both a geographic component and a product … component,"

14  and "comprises any grouping of sales whose sellers, if unified by a monopolist or a hypothetical

15  cartel, could profitably raise prices above a competitive level." *Epic Games*, 67 F.4th at 975

16  (cleaned up). Any producers whose sales could "could substantially constrain the price-increasing

17  ability of the monopolist or hypothetical cartel … must be included in the market." *Id.* (cleaned

18  up). This inquiry depends on whether products are reasonably interchangeable—i.e., whether the

19  products have a sufficient cross-elasticity of demand.

20  Plaintiffs assert that the relevant market is the nationwide market for disposable battery

21  products. Compl. at 22. Disposable batteries, according to the complaint, are a standardized product

22  for which there are no reasonable substitutes. *Id.* at 10, 22. Plaintiffs allege that there are significant

23  barriers to entry because of the critical minerals used to produce these batteries, safety concerns and

24  regulations, high capital costs of manufacturing facilities, and ad spending by incumbents. *Id.* at 11,

25  31. Defendants challenge whether plaintiffs have adequately established harm in this market, but

26  they do not take direct issue with plaintiffs' proposed market definition. Accordingly, at the pleading

27  stage, the Court will accept plaintiffs' market definition and focus its analysis on whether plaintiffs

28  have adequately alleged sufficient anticompetitive effects in that market via direct or indirect proof.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

#### b.       Direct Evidence of Effects on Competition

"To prove a substantial anticompetitive effect directly, the plaintiff must provide proof of actual detrimental effects on competition such as reduced output, increased prices, or decreased quality in the relevant market." *PLS.Com*, 32 F.4th at 834 (cleaned up).

Plaintiffs plead evidentiary facts asserting price increases at several levels of the market. First, they claim that as early as 2018 Energizer imposed "widespread wholesale price increases for direct purchasers other than Walmart," including an 8% price increase for some of its products in 2019, a 10% increase across all products in September and October 2020, another 10% increase for some product lines in April 2021, and an 11% increase for all household batteries in June 2021. Compl. at 16–17. Next, plaintiffs assert that Walmart increased retail prices for Energizer batteries by an even greater margin. *Id.* They allege, for example, that Walmart increased retail prices for certain Energizer batteries by 20% in late 2019 and 40% in early 2020. *Id.* Finally, they plead evidentiary facts suggesting that retail prices for Duracell batteries were also affected, with overall retail prices for batteries increasing 8.2% from 2017 to 2018. *Id.* at 20. In short, while plaintiffs allege that the *agreement* pertained only to Energizer wholesale prices, they allege that its *effects* extended not only to Energizer's wholesale prices and to retail prices for Energizer batteries at Walmart and other retailers but also to retail prices for *other* manufacturers' batteries.[7]

Of course, plaintiffs will eventually have to *prove* that these direct effects resulted from the alleged agreement. But at the pleading stage, plaintiffs are only required to "sketch the outline of the injury to competition with allegations of supporting factual detail" that are enough to "raise a reasonable expectation that discovery will reveal evidence of an injury to competition." *Brantley v. NBC Universal, Inc.*, 675 F.3d 1192, 1198 (9th Cir. 2012) (cleaned up). This they have done.

---

[7] Because plaintiffs have adequately alleged harm to both inter- and intrabrand competition, the Court need not determine whether allegations of intrabrand competition alone would be sufficient.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### c.       Indirect Evidence of Effects on Competition

"To prove a substantial anticompetitive effect indirectly, a plaintiff must show that the defendants have market power in the relevant market and that the challenged restraint harms competition." *PLS.Com*, 32 F.4th at 834 (quoting *Amex*, 138 S. Ct. at 2284).

"Market power is the ability for a defendant to profitably raise prices" and "is generally inferred from the defendant's possession of a high market share and the existence of significant barriers to entry." *Epic Games*, 67 F.4th at 983 (cleaned up). "The existence of market power … casts an anticompetitive shadow over a party's practices in a rule-of-reason case." *Hahn v. Oregon Physicians' Serv.*, 868 F.2d 1022, 1026 (9th Cir. 1988).

Because there are two defendants here, a threshold question is which of them must possess market power and how this power should be measured in evaluating their combined actions. Plaintiffs assert that Energizer had around 40% of the U.S. market for disposable batteries in January 2018 and that this market share has since grown to above 50%. Compl. at 23. They also assert that at the retail level for disposable battery products, "there is a single dominant firm, Walmart." Compl. at 12. They do not assign a particular share of this market to Walmart, although they do allege that Walmart accounted for 14.1% of Energizer's annual sales in fiscal year 2020 and that "Walmart has market power in many local 'brick and mortar' retail markets." *Id.* at 12, 31.

Pointing to the Supreme Court's decision in *Leegin Creative Leader Products, Inc. v. PSKS, Inc.*, 551 U.S. 877 (2007), defendants argue that plaintiffs' theory of market harm "fails because it depends on *Walmart* having market power in the retail market for sales of batteries—which Plaintiffs do not, and cannot, allege with any facts." Motion at 29. Under defendants' interpretation of *Leegin*, an agreement *cannot* harm competition unless the purported source of the restraint (here, Walmart) has market power. Reply at 31.

*Leegin* does not support defendants' arguments. In *Leegin*, a manufacturer had a retail pricing policy under which it refused to sell goods to retailers that discounted its products below suggested prices. 551 U.S. at 882. After one retailer refused to stop discounting the manufacturer's products, the manufacturer stopped selling to that retailer. Overruling its previous precedent, the Supreme Court determined that this vertical agreement was subject to the rule of reason rather

14

1    than a per se prohibition, reasoning that retail price maintenance agreements might benefit as well

2    as harm competition. *See id.* at 882–907. In so holding, the Supreme Court explained:

3              [T]hat a dominant manufacturer or retailer can abuse resale price
               maintenance for anticompetitive purposes may not be a serious
4              concern unless the relevant entity has market power. If a retailer lacks
               market power, manufacturers likely can sell their goods through rival
5              retailers. And if a manufacturer lacks market power, there is less
               likelihood it can use the practice to keep competitors away from
6              distribution outlets.

7

8    *Id.* at 898 (cleaned up).

9          Defendants argue that under the reasoning in this part of the *Leegin* opinion, the restraint

10   plaintiffs allege *cannot* harm competition if Walmart does not have market power. *See* Reply at

11   31. But the structure of the agreement plaintiffs allege is distinct from standard retail price

12   maintenance agreements like the one considered in *Leegin* where a dominant manufacturer sets

13   prices for all retailers. Plaintiffs allege that Walmart (the retailer) was given the ability to control

14   its competitors' retail prices by virtue of Energizer's market power. Even assuming Walmart lacks

15   market power, under the agreement as alleged Energizer cannot freely sell its goods through rival

16   retailers at retail prices lower than Walmart's. Accordingly, the "relevant entity" here is not solely

17   Walmart, but rather the combination of Energizer and Walmart.

18         Defendants also ignore *Leegin*'s relevant cautions. In the paragraph before the one they

19   cite, for example, the Supreme Court counseled that the "source of the restraint may also be an

20   important consideration" and that if "retailers were the impetus for a vertical price restraint, there

21   is a greater likelihood that the restraint facilitates a retailer cartel or supports a dominant,

22   inefficient retailer." 551 U.S. at 897–98. *Leegin* also warned that "[r]esale price maintenance

23   should be subject to more careful scrutiny" if the agreements "cover the bulk of an industry's

24   output." *Id.* at 897 (quoting F. Scherer & D. Ross, *Industrial Market Structure and Economic*

25   *Performance* 558 (3d ed.1990)). Plaintiffs allege that both of these conditions are present here.

26         In considering defendants' market power, what ultimately matters are the details of the

27   specific alleged agreement and its effect on the relevant market. Plaintiffs' allegations are enough

28   to establish that Energizer exercises market power and that, regardless of Walmart's own potential

United States District Court
Northern District of California

15

1   market power, it was able to exercise influence over Energizer in a manner that effectively

2   *delegated* Energizer's market power to Walmart and gave Walmart the ability to set retail prices

3   and increase wholesale prices for Energizer products. This is in addition to Walmart's obvious

4   ability to control the retail prices of *all* battery products at its own stores.

5          In short, under terms of the agreement as alleged, Walmart was given the ability to

6   exercise the combined market power possessed by both Walmart and Energizer within the

7   wholesale and retail markets for disposable battery products. These allegations plausibly suggest

8   that defendants, together, exercised sufficient market power to support a finding of substantial

9   anticompetitive effects via indirect evidence.

10         The next question is whether plaintiffs have adequately alleged that defendants used this

11   market power to harm competition. "This inquiry need not always be extensive or highly

12   technical. It is sufficient that the plaintiff prove the defendant's conduct, as matter of economic

13   theory, harms competition." *Epic Games*, 67 F.4th at 983–84 (cleaned up). An agreement that

14   prevents retailers from selling products below a certain price harms competition in one of the

15   simplest ways possible: by preventing retailers from competing on the basis of price to increase

16   sales. Plaintiffs also argue that their direct evidence of anticompetitive effects—the price increases

17   discussed above—are sufficient to establish harm to competition. Opp. at 44. The Court agrees.

18         Defendants raise several counterarguments that focus on hypothetical actions Energizer

19   could take on its own, without an agreement with Walmart, that would be similar to the actions

20   taken pursuant to the alleged agreement. They assert that Energizer's "alleged actions—raising

21   wholesale prices and monitoring retail prices of its distribution network—are things Energizer can

22   do on its own, without the aid of Walmart," and that as a result, "there is no incremental restraint

23   on competition from the alleged scheme that goes beyond what Energizer can lawfully do on its

24   own." Reply at 30. They also argue that because Energizer distributes a trademarked product,

25   Energizer could permissibly "enter into an exclusive agreement with a single retailer to distribute

26   its products without unreasonably harming competition," and it therefore follows that Energizer

27   "can agree with a single retailer to provide it the best wholesale pricing available," effectively a

28   "most-favored nation … provision." Motion at 31–32.

United States District Court
Northern District of California

1    These arguments fail. First, that a business can take certain actions independently without

2    violating the Sherman Act does not necessarily establish that such actions do not harm

3    competition. It simply reflects that Section 1 does not apply to unilateral conduct at all, regardless

4    of its effect on competition. *See Fisher v. City of Berkeley*, 475 U.S. 260, 266 (1986).

5    Second, Defendants understate the substance of plaintiffs' allegations. Plaintiffs assert not

6    just that Energizer raised wholesale prices and monitored retail prices, but that Energizer raised

7    wholesale prices to force other retailers who undercut Walmart to raise their prices. They assert

8    not that Energizer promised Walmart its most favorable wholesale prices, but that it effectively

9    delegated to Walmart substantial (if indirect) control of the wholesale prices Energizer charged to

10   *other* retailers. And they assert that these coordinated actions resulted in price increases across the

11   relevant market. Because the rule-of-reason analysis must always be tailored to the specific facts

12   of each case, the question here is not whether similar conduct in other situations might be

13   undertaken without harming the market, but whether the specific alleged conduct in this case has

14   plausibly been alleged to harm competition. For the reasons set forth herein, Plaintiffs have

15   satisfied that burden.

16   To be certain, as defendants emphasize, the Supreme Court has held that vertical price

17   restraints and other vertical restraints are sometimes justified and can stimulate competition. *See*

18   *Leegin*, 551 U.S. at 890. Defendants will have an opportunity to demonstrate procompetitive

19   rationales for the alleged restraints at a later stage of these proceedings. But the Supreme Court

20   has also counseled that vertical pricing agreements can create "economic dangers" in addition to

21   their potential benefits, and that courts must therefore "be diligent in eliminating their

22   anticompetitive uses from the market." *Id.* at 897. Determining whether the alleged agreement

23   between Energizer and Walmart can ultimately be justified by benefits to competition that

24   outweigh any harm will be a complex and fact-specific inquiry. At the pleading stage, plaintiffs

25   have done enough to allow their claims to move forward.

26          **3.      All Three Sets of Plaintiffs Have Antitrust Standing.**

27   "To plead a Sherman Act claim, a private plaintiff must show that it is a proper party to

28   pursue the claim—a requirement known as antitrust standing." *City of Oakland v. Oakland*

1    *Raiders*, 20 F.4th 441, 448 (9th Cir. 2021). Defendants do not argue that the non-Walmart retailers

2    like Portable Power who purchased Energizer batteries from Energizer at allegedly inflated

3    wholesale prices lack antitrust standing, nor do they argue that customers such as Mr. Copeland

4    who purchased Energizer batteries from those sellers at correspondingly inflated retail prices lack

5    antitrust standing to pursue injunctive relief. Instead, they challenge the antitrust standing of only

6    the *Schuman* plaintiffs, who purchased Energizer and Duracell batteries directly from Walmart.

7    Defendants assert that these Walmart customer plaintiffs "did not pay any price that is alleged to

8    have been inflated by the claimed conspiracy," and that the "chain of causation" for this injury is

9    "too indirect and speculative to be actionable under the antitrust laws." Motion at 37.

10         Courts balance several factors to determine whether a plaintiff has antitrust standing,

11    including: "(1) the nature of the plaintiff's alleged injury; that is, whether it was the type the

12    antitrust laws were intended to forestall; (2) the directness of the injury; (3) the speculative

13    measure of the harm; (4) the risk of duplicative recovery; and (5) the complexity in apportioning

14    damages." *Oakland Raiders*, 20 F.4th at 455.

15         The first factor, whether the injury is of a type the antitrust laws were intended to forestall

16    (i.e., whether the plaintiff suffered an "antitrust injury"), "is mandatory." *Oakland Raiders*, 20

17    F.4th at 456. There are "four requirements for antitrust injury: (1) unlawful conduct, (2) causing an

18    injury to the plaintiff, (3) that flows from that which makes the conduct unlawful, and (4) that is of

19    the type the antitrust laws were intended to prevent." *Id.* Here, the Walmart customer plaintiffs

20    have alleged unlawful conduct as discussed above. They have also alleged an injury: that they paid

21    inflated prices. They also assert that this injury flows from the unreasonable (and therefore

22    unlawful) aspects of the agreement: its restraint of prices. Finally, the injury they allege—

23    consumers being forced to pay higher prices—is exactly the sort the antitrust laws aim to prevent.

24    The Walmart customers have thus alleged the type of injury needed to state a Sherman Act claim.

25         The second factor is the directness of the injury. "This factor focuses on the chain of

26    causation between the plaintiff's injury and the alleged restraint of trade. The harm may not be

27    derivative and indirect or secondary, consequential, or remote." *Oakland Raiders*, 20 F.4th at 458.

28    Here, plaintiffs do not allege that Energizer and Walmart specifically agreed that Walmart would

raise its own retail prices for disposable battery products. But they do allege that the agreement, by protecting Walmart from retail price competition, "*allowed* Walmart to raise the prices it charged at retail" for both Energizer and Duracell products. *Schuman* Compl. at 18 (emphasis added). Even if raising Walmart's retail prices was not a *term* of the agreement as alleged, it is obvious how it could be a direct, foreseeable *result* of the agreement. And because the complaint challenges *Walmart*'s pricing of Duracell products, it does not necessarily require, as defendants argue, a separate inquiry into Duracell's own pricing practices. *See* Motion at 39–40. There is therefore a sufficiently direct chain of causation between the alleged restraint and the *Schuman* plaintiffs' alleged injury.

The third factor is whether the "damages are only speculative." *Oakland Raiders*, 20 F.4th at 460. Here, the Walmart customers' alleged damages are not speculative. First, as discussed above, they flow directly from the alleged agreement. Second, while defendants argue that "many factors—such as raw material pricing and availability, shipping and distribution costs, and changes in demand or business strategy, or macroeconomic factors like inflation—can influence price," Motion at 28, plaintiffs plausibly argue that defendants' price increases went beyond what would be justified by these other factors. Moreover, many of these factors are quantifiable based on information that is either publicly available or within defendants' control. That damages may be complex to measure does not mean they are speculative. *See Am. Ad. Mgmt.*, 190 F.3d at 1059. Assuming defendants entered into the alleged agreement and increased prices accordingly, as plaintiffs have plausibly alleged, it is fairly certain that Walmart customers will have been injured. How much is a harder question for a later day, but the existence of that harm is not speculative.

Finally, defendants argue that the remaining factors overlap with the indirectness inquiry, but they do not specifically argue that there is a significant risk of duplicative recovery or insurmountable complexity in apportioning damages.

On balance, considering all five factors, the Court concludes that the *Schuman* plaintiffs have adequately pleaded antitrust standing. Because all three sets of plaintiffs have adequately pleaded their Sherman Act claims, defendants' motion to dismiss those claims is denied.

United States District Court
Northern District of California

**B.      Plaintiffs Have Adequately Pleaded Their State Law Claims.**

In addition to their federal claims, the *Copeland* plaintiffs also bring twenty-seven state antitrust claims[8] and seventeen state consumer protection claims.[9] They assert that the essential elements for each of the state antitrust claims are the same, and that the same alleged conduct they say violates the Sherman Act also establishes each of the state antitrust claims. They also assert that the alleged conduct constitutes unfair competition, unconscionable conduct, and deceptive acts and practices in violation of state consumer protection laws. The *Portable Power* and *Schuman* plaintiffs assert claims under California's Cartwright Act and Unfair Competition Law in addition to their Sherman Act claims.

Defendants argue that the *Copeland* plaintiffs do not have standing to assert claims under the laws of states where none of the named plaintiffs resided or purchased products, and that the state antitrust and consumer protection claims fail for the same reasons the Sherman Act claims fail. For the reasons that follow the Court rejects each of these arguments and denies defendants' motion to dismiss plaintiffs' state law claims.

**1.      Plaintiffs Have Article III Standing To Pursue Their State Law Claims.**

Defendants first argue that the *Copeland* plaintiffs lack Article III standing to pursue class claims under the laws of states where they do not live and have not made relevant purchases. But whether an out-of-state plaintiff can pursue claims under the law of a particular state presents a merits question, not a question of Article III standing. "While a plaintiff's likelihood of procuring a favorable decision may be minimal where the plaintiff cannot assert claims under the laws at issue, that inquiry goes to the merits of the plaintiff's claim, not to the existence of an Article III 'Case' or 'Controversy.' As the Supreme Court has explained, 'the absence of a valid ... cause of

---

[8] These include the antitrust laws of Arizona, California, Connecticut, the District of Columbia, Illinois, Iowa, Kansas, Maine, Maryland, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Puerto Rico, Rhode Island, South Dakota, Tennessee, Utah, West Virginia, and Wisconsin.

[9] These include the consumer protection laws of California, the District of Columbia, Florida, Hawaiʻi, Idaho, Massachusetts, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Mexico, North Carolina, Rhode Island, South Carolina, Utah, and Vermont.

United States District Court
Northern District of California

1   action does not implicate subject-matter jurisdiction, i.e., the courts' statutory or constitutional

2   *power* to adjudicate the case.'" *Urban v. Tesla, Inc.*, __ F. Supp. 3d __, No. 22-CV-07703-PCP,

3   2023 WL 6796021, at *2 (N.D. Cal. Oct. 13, 2023) (quoting *Steel Co. v. Citizens for a Better*

4   *Environment*, 523 U.S. 83, 89 (1998)). Because Defendants moved solely under Rule 12(b)(1), the

5   Court denies Defendants' motion to dismiss all *Copeland* claims arising under the laws of states

6   where no named plaintiff lives or purchased batteries.[10]

7         **2.**     **Plaintiffs Have Adequately Pleaded State Antitrust Claims.**

8        Defendants argue that the state antitrust claims fail for the same reason as the federal

9   claims, and do not offer any independent reasons for dismissing the state antitrust claims. Because

10   the Court has concluded that all three sets of plaintiffs have adequately pleaded Sherman Act

11   claims, defendants' motion to dismiss the corresponding state antitrust claims is denied.

12         **3.**     **Plaintiffs Have Adequately Pleaded State Consumer Protection Claims.**

13        Defendants also argue that the state consumer protection claims fail because they are

14   predicated on the same conduct that underlies the Sherman Act claims. As with the state antitrust

15   claims, defendants offer no independent reasons for dismissing the state consumer protection

16   claims. The motion to dismiss the state consumer protection claims is therefore also denied.

17   **IV.**    **Conclusion**

18        Defendants' motion to dismiss is denied. Pursuant to the parties' stipulation and the

19   Court's September 18, 2023 order, the stay on discovery and disclosures in these cases is lifted.

20

21        **IT IS SO ORDERED.**

22   Dated: February 9, 2024

23   _____

24   P. Casey Pitts
      United States District Judge

25

26   ————————————————

27   [10] Courts in this district and circuit are divided on the propriety of dismissing at the pleading stage claims arising under the laws of states where no named plaintiff lived or was harmed. *See, e.g.*, *In re JUUL Labs, Inc., Mktg., Sales Practices, & Products Liab. Litig.*, 533 F. Supp. 3d 858, 881 (N.D. Cal. 2021) (summarizing split). Because defendants moved solely under Rule 12(b)(1), the

28   Court need not take a position on the issue at this time.