United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

DON COPELAND, *et al.*,
Plaintiffs,
v.
ENERGIZER HOLDINGS, INC., and WALMART, INC.,
Defendants.

PORTABLE POWER, INC., *et al.*,
Plaintiffs,
v.
ENERGIZER HOLDINGS, INC., and WALMART, INC.,
Defendants.

KIMBERLY SCHUMAN *et al.*
Plaintiffs,
v.
ENERGIZER HOLDINGS, INC.; and WALMART, INC.,
Defendants.

Case Nos. 5:23-CV-02087-PCP-SVK, 5:23-CV-02091-PCP-SVK, 5:23-CV-02093-PCP-SVK

**ORDER DENYING MOTIONS FOR CLASS CERTIFICATION WITHOUT PREJUDICE AND DENYING MOTIONS TO EXCLUDE PLAINTIFFS' EXPERTS**

In these three putative class actions, consumers of Energizer batteries sue defendants Energizer and Walmart for allegedly conspiring to keep the prices of Energizer batteries high and eliminate price competition, particularly from online retailers. Plaintiffs in the proposed *Portable Power* class now seek to certify a class of wholesale purchasers who bought batteries directly from Energizer from September 1, 2019, to December 31, 2023, as well as a California subclass. No. 5:23-cv-02091. Plaintiffs in the proposed *Schuman* class seek to certify a class of consumers who bought Energizer batteries directly from brick-and-mortar Walmart stores from September 1, 2019, to November 21, 2025. No. 5:23-cv-02093. And plaintiffs in the proposed *Copeland* class

United States District Court
Northern District of California

seek to certify a class of consumers who bought affected batteries indirectly from September 1, 2019, through November 21, 2025. No. 5:23-cv-2087. Defendants move to exclude plaintiffs' experts Dr. Hal Singer and Dr. Kevin Caves. For the following reasons, the Court denies the plaintiffs' motions for class certification without prejudice to a possible future motion supported by different evidence and denies defendants' motions to exclude plaintiffs' experts.

**BACKGROUND**

In the late 2010s, Walmart was Energizer's largest customer. *See* Class Certification Report of Hal J. Singer, Ph.D., Exh. 2, Dkt. No. 133-4 ¶ 14 n.12 (Nov. 21, 2025) [hereinafter Singer Report].[1] But Walmart faced the threat of competition from online retailers such as Amazon who could offer end consumers lower prices on Energizer products relative to brick-and-mortar retailers like Walmart. *Id.* ¶ 13–15. In late 2017 and early 2018, Walmart pressured Energizer to monitor online retailers and prevent them from undercutting Walmart on prices for Energizer's headlamp, a type of flashlight one can wear on one's head. *Id.* ¶ 15.

In late 2018, Energizer created a "Pricing Preservation Project," which it later renamed to "Project Hermes." *Id.* ¶ 16; Exh. 33, Dkt. No. 133-35. Project Hermes sought to keep Energizer's retail prices high. *Id.* According to internal Energizer emails, in April 2019, Energizer learned that Walmart's "frustration is extremely high regarding their pricing position vs. [Amazon]" for headlamps pricing. No. 5:23-cv-02087, Exh. 3, Dkt. No. 136-5. Walmart complained to Energizer that third-party retailers continued to undercut Walmart on headlamp prices, culminating in Walmart instituting a July 2019 "rollback," or mandated retail price cut. *See* Exh. 3, Dkt. No. 133-5. Energizer compensated Walmart for the loss it would sustain under the rollback by paying the retailer the difference. *Id.* Walmart promised that if Energizer could keep other retailers' prices of Energizer's headlamps above Walmart's desired price for 13 weeks, then Energizer could stop subsidizing Walmart's rollback. *See id.*

In 2019, Walmart and Energizer allegedly expanded their efforts to Energizer's batteries,

---

[1] Unless otherwise indicated, docket number references are to the entry number in No. 5:23-cv-02091, *Portable Power, Inc. v. Energizer Holdings, Inc.*

specifically Energizer's AA, AAA, C, D, and 9V batteries. Energizer reported internally that Walmart "threatened to put us on rollback at holiday if we did not get a handle on our eComm[erce] pricing," which would entail Energizer paying Walmart until that point. No. 5:23-cv-02087, Exh. 65, Dkt. No. 136-67, at 311; No. 5:23-cv-02087, Exh. 31, Dkt. No. 136-33, at 362. Energizer called its effort to ensure that online retailers' prices matched Walmart's the "Walmart Challenge". No. 5:23-cv-02087, Dkt. No. 136-33, at 362. Energizer calculated how much it would have to pay Walmart for Walmart to match online retailers' prices and estimated that doing so would cost around $55 million per year. *Id.* at 363.

Energizer took several steps to discipline retailers who were selling below Walmart, an endeavor internally referred to as "Project Atlas." For example, Energizer cut off Amazon from selling several of Energizer's products, Exh. 39, Dkt. No. 133-41, at 00576088, and within months, Energizer celebrated that some battery prices had increased on Amazon, Direct Purchaser Plaintiffs' Notice of Motion and Motion for Class Certification, Dkt. No. 133-1, at 11 [hereinafter DPP Motion]; Exh. 53, Dkt. No. 133-55, at 00191640–41. Energizer also monitored and flagged Walmart competitors who undercut Walmart on price and tracked "actions being taken at each retailer to address pricing," Exh. 41, Dkt. No. 133-43, at 00325524–31, including by raising wholesale prices to those competitors, *see, e.g.*, Exh. 42, Dkt. No. 133-44; Exh. 43, Dkt. No. 133-45. Energizer also established an authorized reseller policy that required smaller retailers to apply for the ability to sell Energizer products online. Exh. 33, Dkt. No. 133-35; No. 23-cv-2087, Exh. 45, Dkt. No. 136-47, at 00001745. Energizer started policing orders and considered price increases or refusing to ship products to them. *See, e.g.*, Exh. 46, Dkt. No. 133-48; Exh. 47, Dkt. No. 133-49. Plaintiffs maintain that Energizer weighed the risk of retailers walking away from Energizer against the benefit of satisfying Walmart. DPP Motion at 12.

After Energizer's efforts in Project Atlas, Walmart appears to have declined to pursue a rollback on Energizer batteries. Exh. 61, Dkt. 133-63. By November 2020, Energizer employees understood Project Atlas, and its alleged ability to maintain higher prices, as "part of our steady state business," with an Energizer employee explaining, "'Atlas Project' is a term that signals that there is an 'end' date to this initiative and that is not how we want people thinking about it. Atlas

did a great job setting the foundation …, but that project team has been dissolved and we have instead in permanent resources to carry it forward.” No. 23-cv-02087, Exh. 60, Dkt. No. 136-62, at 00076319.

## LEGAL STANDARDS

Federal Rule of Civil Procedure 23 governs class certification. A party seeking class certification must first satisfy the requirements of Rule 23(a) by demonstrating that

> (1) the class is so numerous that joinder of all members is impracticable;
>
> (2) there are questions of law or fact common to the class;
>
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
>
> (4) the representative parties will fairly and adequately protect the interests of the class.

In addition to satisfying the requirements of Rule 23(a), the proposed class “must satisfy at least one of the three requirements listed in Rule 23(b).” *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 345 (2011). Plaintiffs seek certification under Rule 23(b)(3), which requires that common questions of law or fact “predominate over any questions affecting only individual members, and that a class action [be] superior to other available methods for fairly and efficiently adjudicating the controversy.” Fed. R. Civ. P. 23(b)(3).

The party seeking class certification “must affirmatively demonstrate [its] compliance with Rule 23.” *White v. Symetra Assigned Benefits Serv. Co.*, 104 F.4th 1182, 1192 (9th Cir. 2024) (citation modified). Thus, plaintiffs “must actually *prove*—not simply plead—that their proposed class satisfies each requirement of Rule 23, including ... the predominance requirement of Rule 23(b)(3).” *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 275 (2014). Plaintiffs must show entitlement to class certification by a preponderance of the evidence. *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 664–65 (9th Cir. 2022) (en banc).

United States District Court
Northern District of California

## ANALYSIS

### I. *Portable Power*, 23-cv-2091, and *Schuman*, 23-cv-2093

Plaintiffs in *Portable Power*, No. 5:23-cv-02091, and *Schuman*, No. 5:23-cv-02093, together seek to certify four classes: a wholesale nationwide class, a wholesale California subclass, a Walmart nationwide class, and a Walmart California subclass. DPP Motion at 1–2. The proposed wholesale nationwide class is defined as:

> All persons and entities other than the "Excluded Entities" that purchased Energizer Class Batteries directly from Defendant Energizer Holdings, Inc. ("Energizer") in the United States at any time from September 1, 2019, to December 31, 2023 (the "Wholesale Class Period"). "Class Batteries" are defined as disposable AA, AAA, C, D, 9V, or CR2032 batteries. "Energizer Class Batteries" are defined as Energizer-manufactured Class Batteries. The Wholesale Plaintiffs seek certification of the Wholesale Nationwide Class to pursue damages claims under Section 1 of the Sherman Act, 15 U.S.C. § 1, against Energizer and Defendant Wal-Mart, Inc. ("Walmart"). The Wholesale Nationwide Class and California Subclass (referred to as the "Wholesale Class") seeks damages for purchases made between September 1, 2019, and the start of trial, March 27, 2028 ("Wholesale Damages Period").

The wholesale California subclass is defined as:

> All Wholesale Class members that made their qualifying purchases as billed to, shipped to, or paid for from California. The Wholesale Plaintiffs seek certification of the Wholesale California Subclass to pursue damages claims under Section 1 of the Sherman Act and the Cartwright Act, Cal. Bus. & Prof. Code §§ 16720, *et seq.*, against Energizer and Walmart.

The Walmart nationwide class is defined as:

> All persons and entities that purchased Energizer or Duracell Class Batteries directly from a Walmart brick-and-mortar store in the United States at any time from September 1, 2019, to November 21, 2025 (the Walmart "Class Period" and "Damages Period") without using Walmart Pay or Mobile Scan & Go. "Duracell Class Batteries" are defined as Duracell-manufactured Class Batteries. The Walmart Plaintiffs seek certification of the Walmart Nationwide Class to pursue damages and injunctive relief claims under the Sherman Act against Energizer. For the avoidance of doubt, the Walmart Nationwide Class and California Subclass (referred to as the "Walmart Class") is not seeking damages for purchases made online, via Walmart+, for in-store pick up, or from Sam's Club.

The Walmart California subclass is defined as:

> All Walmart Class members that made their qualifying purchases from a Walmart brick-and-mortar store in California. The Walmart Plaintiffs seek certification of the Walmart California Subclass to pursue damages and injunctive relief claims under the Sherman Act and the Cartwright Act against Energizer.

### A. The *Portable Power* and *Schuman* plaintiffs satisfy 23(a).

#### 1. Numerosity

The *Portable Power* and *Schuman* plaintiffs have demonstrated that the proposed classes are "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). Rule 23's numerosity requirement is generally satisfied when the proposed class contains 40 or more members. *See J.L. v. Cissna*¸ 2019 WL 415579, at *8 (N.D. Cal. Feb. 1, 2019); *Corley v. Google, Inc.*, 316 F.R.D. 277, 290 (N.D. Cal. 2016). Plaintiffs argue, and defendants do not contest, that the proposed classes contain thousands of members. Singer Report ¶ 114 ("There are 2,303 Wholesale Class members that made at least one purchase of Energizer Class Batteries during the Class Period."), ¶ 120 (estimating over 378 million transactions for Walmart products).

#### 2. Commonality

"Commonality mandates there be a common question of law or fact among the class members where the same evidence will suffice for each member to make a prima facie showing or the issue is susceptible to generalized, classwide proof." *Small v. Allianz Life Ins. Co. of N. Am.*, 122 F.4th 1182, 1198 (9th Cir. 2024) (citation modified). In other words, commonality exists where "the evidence establishes that a common question is *capable* of class-wide resolution." *Noohi v. Johnson & Johnson Consumer Inc.*, 146 F.4th 854, 863 (9th Cir. 2025) (quoting *Olean*, 31 F.4th at 666–67). "To satisfy commonality, even a single common question is enough." *Small*, 122 F.4th at 1198 (citation modified) (quoting *Wal-Mart*, 564 U.S. at 359).

Here, every proposed class member's claim turns on several common questions including whether Walmart and Energizer entered into an agreement, whether their actions violated the antitrust laws, and whether their actions resulted in higher prices to plaintiffs. The answers to those factual and legal questions "will resolve [] issue[s] that [are] central to the validity of each

one of the claims in one stroke." *Wal-Mart*, 564 U.S. at 350. Defendants do not contest commonality. Thus, the commonality requirement is also satisfied.

**3. Typicality**

Defendants do not dispute that the *Schuman* plaintiffs' claims are typical of those of the class. Defendants argue, however, that plaintiffs Portable Power and Micropower are not typical or adequate class representatives for the *Portable Power* wholesale class and subclass because they "were small, grey-market sellers who repeatedly violated Energizer's policies to obtain competitive advantages over the large, professionally managed retailers like Home Depot and Target who make up the vast majority of the proposed Wholesale Class." Opposition at 46. Defendants allege that Portable Power illegally obtained internal Energizer communications and documents and have filed counterclaims against Portable Power and certain individual defendants on that basis. *See Portable Power, Inc. v. Energizer Holdings, Inc.*, 2026 WL 2227359 (N.D. Cal. Aug. 3, 2026). Defendants also maintain that Portable Power and Micropower violated Energizer's policies by buying Energizer batteries in bulk and re-packaging those batteries in their own packaging. Opposition at 47 (citing Portable Power Dep., Exh. 16, Dkt. No. 185-19, at 111:5–21). And defendants argue that Micropower continued to sell Energizer batteries online despite being prohibited from doing so by Energizer because Micropower failed to enroll in Energizer's online authorization program. Opposition at 47. Thus, defendants argue that both Portable Power and Micropower will have to address specific issues and potential defenses that distinguish them from other retailers. Opposition at 47.

"Although [defendants] name[] both typicality and adequacy in [their] argument, [their] contention that Plaintiffs will be preoccupied with unique defenses falls within our typicality caselaw." *DZ Reserve v. Meta Platforms, Inc.*, 96 F.4th 1223, 1238 (9th Cir. 2024). A class plaintiffs' claims should be "reasonably co-extensive with those of absent class members; they need not be substantially identical." *Id.* (quoting *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998), *overruled on other grounds by Wal-Mart*, 564 U.S. at 338). But a "named plaintiff is not typical if there is a danger that absent class members will suffer if their representative is preoccupied with defenses unique to it." *Id.* (quoting *Hanon v. Dataproducts Corp.*, 976 F.2d 497,

United States District Court
Northern District of California

508 (9th Cir. 1992)) (cleaned up).

Portable Power's and Micropower's claims are "reasonably co-extensive with those of absent class members" despite the risk that defendants will face issues that are unique to them and not "substantially identical" to those of other class members. *Id.* Portable Power and Micropower are accused of violating Energizer's rules for resellers. But plaintiffs' theory is that Energizer and Walmart "agreed on a scheme to stifle price competition and inflate wholesale and retail battery prices." DPP Motion at 3. To the extent that their purported policy violations actually involved pretextual attempts by Energizer to discipline maverick resellers outcompeting Walmart, they continue to be typical plaintiffs under their theory of the case. Therefore, Portable Power and Micropower have shown that they are typical plaintiffs under Rule 23(a).

#### 4. Adequacy

Rule 23(a)(4) requires that the plaintiffs "will fairly and adequately protect the interests" of the proposed class. "The adequacy inquiry is addressed by answering two questions: (1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class? If either answer is no, the representative is inadequate." *Small*, 122 F.4th at 1202 (citation modified). To satisfy these criteria, a "class representative must be part of the class and possess the same interest and suffer the same injury as the class members." *Amchem Prods. v. Windsor*, 521 U.S. 591, 625 (1997) (citation modified). Defendants do not challenge class certification on adequacy grounds, aside from challenging the typicality of Portable Power and Micropower as lead plaintiffs. *See supra*.

As to the proposed class representative, the moving plaintiffs state that they do not have any conflicts of interest with absent class members. DPP Motion at 15. Plaintiffs bought the class product batteries from defendants and share an interest with absent class members in establishing defendants' liability. As to the proposed class counsel, the Court is satisfied that they will "prosecute the action vigorously on behalf of the class" given their experience in class action litigation. *Small*, 122 F.4th at 1202.

Consequently, plaintiffs satisfy the adequacy requirement of Rule 23(a)(4).

**B. The *Portable Power* and *Schuman* plaintiffs have not yet satisfied 23(b)(3).**

Rule 23(b)(3) requires that the common questions of law or fact identified above "predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Rule 23(b)(3)'s predominance inquiry "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods.*, 521 U.S. at 623. "The commonality and predominance inquiries overlap." *White*, 104 F.4th at 1191. After separating questions common to the legal claims of the class from those that "present individualized issues," courts "analyze whether the common questions predominate over the individual questions." *DZ Reserve*, 96 F.4th at 1233. In essence, this inquiry "asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues." *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016) (citation modified).

"[T]o prove there is a common question of law or fact that relates to a central issue in an antitrust class action, plaintiffs must establish that 'essential elements of the cause of action,' such as the existence of an antitrust violation or antitrust impact, are capable of being established through a common body of evidence, applicable to the whole class." *Olean*, 31 F.4th at 666 (citation modified). At the class certification stage of proceedings, plaintiffs must show predominance by providing "evidence … capable of showing that the [plaintiffs] suffered antitrust impact on a class-wide basis." *Id.* at 681. In *Olean*, the en banc Ninth Circuit affirmed the district court's certification of an antitrust class of direct purchasers of tuna because plaintiffs' economic model was capable of showing that the tuna suppliers' conspiracy raised prices for the entire class. *Id.* at 671, 677.

The *Portable Power* and *Schuman* plaintiffs rely on the report of economist Dr. Hal Singer to argue that they can establish antitrust injury or impact "through a common body of evidence, applicable to the whole class." *Id.* at 666. Defendants contend that Dr. Singer's report is methodologically unsound and therefore does not satisfy plaintiffs' burden at class certification.

**1. Difference-in-Differences (DiD) Regression**

The Ninth Circuit has explained that econometric tools and methods like the ones used by

plaintiffs' experts can demonstrate classwide antitrust injuries. In *Olean*, the plaintiffs' expert "first performed a pricing correlation test" which showed that prices of the defendant tuna suppliers' products "moved up or down together regardless of product or customer type." *Id.* at 671. The shared movement of tuna product prices "thus supported the proposition that the Tuna Suppliers' collusion had a common, supra-competitive impact on their prices," which in turn supported an inference that the suppliers' collusion "would affect direct purchasers on a class-wide basis." *Id.*

The *Olean* plaintiffs' expert then conducted a multiple regression analysis. Multiple regression analysis is a "statistical tool for understanding the relationship between two or more variables," which represent events or attributes that can have two or more values. Daniel L. Rubenfeld & David Card, *Reference Guide on Multiple Regression and Advanced Statistical Models*, *in* National Academies of Sciences, Engineering, and Medicine & Federal Judicial Center, 1 REFERENCE MANUAL ON SCIENTIFIC EVIDENCE 577, 676 (4th ed. 2025) [hereinafter FJC]. Multiple regression analyses estimate relationships between "a variable to explain [] called the dependent variable" and "additional explanatory variables that are thought to produce or be associated with changes in the dependent variable." *Id.* at 580. Multiple regression analyses, and the models they use, can calculate correlations between explanatory and dependent variables while controlling for other explanatory variables. *See id.* at 586. "If a regression model uses appropriate independent or explanatory variables, it can test and isolate the extent to which the actual prices paid by plaintiffs are higher because of a defendant's collusive behavior." *Olean*, 31 F.4th at 671 (cleaned up). Thus, valid multiple regression models can provide evidence of antitrust injury on a classwide basis. *See id.*

One type of multiple regression analysis relies upon "difference-in-differences." Difference-in-differences (DiD) research designs study two groups over time, one of which receives the treatment or intervention of interest while the other does not. The group that receives the treatment is the "treatment group" while the group that does not is the "comparison group." The analyst studies the difference in outcomes between the treatment and comparison groups. *See* FJC at 624. The analyst should choose two groups that are similar enough such that studying them

can control for all or nearly all other relevant explanatory variables besides the treatment effect the analyst seeks to isolate and study. DiD studies provide an estimate of the causal effect of the treatment by subtracting the outcome for the comparison group from the outcome for the treatment group. *See id.* Because the two groups are identical (or similar enough) except for the treatment, the difference in outcomes can be attributed to the effect of the treatment itself and not to other explanatory variables. The premise that the two groups are identical or similar enough to each other is foundational for the DiD research design and called the "parallel trends assumption." *Id.* at 625. The parallel trends assumption requires that, if the treatment group did not receive the treatment, the outcomes for the two groups would have moved in parallel over time. *See id.* In a valid DiD study, the two groups' outcomes should generally move in parallel before the treatment. *See id.*

In seeking to certify their Rule 23(b)(3) wholesale and Walmart classes and subclasses, plaintiffs rely on an expert report from Dr. Hal J. Singer. *See* Singer Report, Dkt. No. 133-4. Singer conducts a DiD regression model taking September 2019 as the date demarcating the before-treatment period from the after-treatment period. Singer Report ¶ 97. Singer sets the dependent variable as class battery prices and the treatment as the presence of the scheme. *Id.* ¶ 98.

Singer sets as the comparison group "Energizer headlamps and lighting products." *Id.* ¶ 99. He does so for two reasons. First, Singer reasons that Energizer did not have market power in headlamps and lighting products, so Energizer and Walmart's scheme would not lead to antitrust injury in those markets. Without market power, the theory goes, Energizer and Walmart's scheme would be ineffective to affect the headlamps and lighting products markets' prices. As Singer notes, "Energizer had *sought* to increase the price of headlamps in response to Walmart's demands, yet had *failed* to do so." *Id.* Second, Singer asserts that "headlamps and lighting product prices are influenced by similar supply-and-demand factors as battery prices, thereby implying that headlamps and lighting product prices serve as a reasonable competitive benchmark to what battery prices would have looked like absent the Scheme." *Id.* Exhibit 2 of Singer's report graphs indexed prices of batteries and lighting products to the wholesale and Walmart classes. *Id.* at 45.

Singer estimates the overcharges to Wholesale Class members using transaction-level sales data of the prices paid by all wholesale and retail direct purchasers from January 2013 to December 2023, amounting to over nine million transactions and over $10 billion in revenue. *Id.* ¶ 101. The resulting regression estimates that defendants' scheme "resulted in an overcharge of approximately 11.1 percent to the Wholesale Class." *Id.* ¶ 102.

Singer also estimated the effect of the scheme on the Walmart class. Using transaction-level sales data for Walmart retail customers from 2013 to 2023, Singer used the same DiD model as he did for the wholesale class, included Duracell class batteries because they are part of the Walmart class, and found that defendant's scheme resulted in a 13.9 percent overcharge to the Walmart class. *Id.* ¶¶ 104, 105.

At the second step of his analysis, Singer sought to establish that the generalized overcharge affected all or almost all class members. *Id.* ¶ 109. To do so, Singer used an "in-sample prediction" and a "price structure." *Id.* ¶ 110. The in-sample prediction method uses the first step's DiD estimates of a generalized overcharge to derive a but-for price that direct purchasers would have paid without the scheme. *Id.* ¶¶ 110–112. Singer then compared the price that the class members would have paid with what class members actually paid and then concluded that any overpayments, either by transaction or on net, establish antitrust injury attributable to the scheme. *Id.* ¶¶ 111, 114. Singer's in-sample prediction found that 99.7 percent of the wholesale class were subject to at least one transaction affected by defendants' scheme and 95.5 percent harmed on net. *Id.* ¶ 114. He also found that 99.7 percent of the wholesale California subclass suffered harm at least once and 93.6 percent suffered harm on net. *Id.* ¶ 116. As to the Walmart class, Singer found that 98.3 percent of transactions during the class period were affected by higher prices stemming from the scheme as well as 98.4 percent of the Walmart California subclass. *Id.* ¶¶ 120, 121.

Singer argues that the few wholesale and Walmart class members for which the in-sample method does not find harm nonetheless likely were harmed because his method would not account for idiosyncratic sources of lower prices such as customer-specific discounts, the "in-sample prediction is inherently conservative" because it attributes downward price shocks not accounted for by the model to the scheme, and because Energizer made use of a common price structure that

United States District Court
Northern District of California

further suggests that all class members would have been affected. *Id.* ¶¶ 114, 120. A pricing structure, according to Singer, refers to how a change in prices "would have propagated to prices paid by all or nearly all Class Members." *Id.* ¶ 123. Singer attempts to establish the existence of a pricing structure to show that the generalized overcharge affected all members of the proposed classes. Energizer documents establish that it puts brands into different groups and seeks to enforce differences in pricing between those brands. *Id.* ¶¶ 124–130. Singer also uses multiple variable regressions to conclude that "prices tend to rise and fall together when general factors change." *Id.* ¶ 131.

Though defendants contest both Singer's general overcharge model, his first step, as well as how he showed that the overcharged affected all class members, his second step, the Court needs only address the first step. To establish a persuasive DiD identification strategy, the choice of lighting products must satisfy the parallel trends assumption—i.e., that the average outcomes for the treated population (class batteries) and comparison population (lighting products) would have evolved in parallel without the treatment effect. *See* Jonathan Roth, Pedro H.C. Sant'Anna, Alyssa Bilinski & John Poe, *What's Trending in Difference-in-Differences? A Synthesis of the Recent Econometrics Literature*, 235 J. OF ECONOMETRICS 2218, 2221 (2023). Both sides explain that the whether the assumption is met depends upon whether one can plausibly infer that the treatment and comparison groups are sufficiently similar as to justify using the comparison group to isolate the causal effect of the treatment. *See* Class Certification Reply Declaration of Hal J. Singer, Ph.D., Exh. 93, Dkt. No. 209-3, ¶¶ 40–42; Rebuttal Expert Report of Catherine Tucker, Ph.D., Exh. B, Dkt. No. 182-5 ¶ 113 (Mar. 6, 2026) [hereinafter Tucker Report]. Put differently, the parallel trends assumption is plausible only if Singer can persuasively establish that, if Energizer and Walmart had not engaged in its allegedly anticompetitive scheme, the mean outcomes in Energizer batteries prices would have changed in parallel to the mean outcomes in lighting products. *See* FJC at 626.

Singer and defendants' economist Dr. Catherine Tucker use several approaches to consider whether Singer's comparison and treatment groups satisfy the parallel trends assumption here, including visual inspections, statistical tests, and the broader market context. Each consideration

United States District Court
Northern District of California

undermines the plausibility of the parallel trends assumption as to the choice of comparison and treatment groups and thus fatally undermines the reliability of the overcharge models at issue.

First, a visual inspection of pre-treatment trends for both batteries and lighting products does not support the parallel trends assumption. Singer provides an exhibit that he claims shows that "headlamps and lighting products exhibit similar pricing behavior" to batteries "prior to September 2019 (which is marked with a dashed, vertical line)." Singer Report ¶ 99.

EXHIBIT 2: CLASS BATTERY AND LIGHTING PRODUCT PRICE INDICES BY CLASS




*Sources*: Energizer transactional data; Walmart sales data.
*Notes*: Price indices obtained by first regressing ln(price) on unit fixed effects and year-month dummy variables for each group (headlamps and lighting products versus batteries) and each class. I then exponentiate the year-month dummy variable coefficients, which provide the hedonic price indices for each product group for each class.

The problem, as defendants' economist Tucker points out, is that a visual inspection of pre-treatment outcomes does not appear to show that batteries and lighting products prices moved in parallel before September 2019. *See* Tucker Report ¶ 123. Tucker observes that, unlike batteries, lighting products "exhibit[] downward spikes and, from around 2016, a substantial decrease in level." Tucker Report ¶ 124.

In Singer's reply declaration attached to plaintiffs' joint reply in support of class certification, Singer argues that when one looks at pre-treatment prices for the Walmart class, lighting products and batteries moved in parallel, especially in the three-and-a-half-year period leading up to September 2019:

EXHIBIT 6: WALMART TREATMENT AND CONTROL GROUP TRENDS, MARCH 2016 – AUGUST 2019




*Sources*: Walmart Sales Data. *See* Singer Declaration workpapers.

Class Certification Reply Declaration of Hal J. Singer, Ph.D., Exh. 93, Dkt. 209-3, at 35 (May 15, 2026) [hereinafter Singer Reply Declaration]. But this inspection again does not support the inference that batteries and lighting products moved in parallel during the shortened pre-treatment period. At multiple points, prices for batteries and lighting products moved in opposite directions, or one stayed constant while the other changed. For example, in March 2016, the price index for batteries fell while the index for lighting products increased sharply. And in the months leading up to September 2019, batteries prices stayed roughly steady or increased while lighting products prices fell sharply. Singer responds to Tucker's "focus[ing] on the high degree of volatility in lighting product prices that begins around the first quarter of 2016" by arguing that the "presence of volatility does not invalidate my model, so long as that volatility would be expected to continue during the treatment period in the but-for world." Singer Reply Declaration ¶ 52. Singer argues that such an expectation—that volatility in lighting product prices would continue during the

treatment period—does indeed "continue into the treatment period." *Id.* Singer's argument is unpersuasive, however, because the volatility of lighting products prices matters insofar as those prices are volatile relative to the prices of class batteries. If both batteries and lighting products exhibited similar volatility, then that fact would suggest that the two are plausible groups to use in a DiD identification strategy. But the volatility of lighting products prices relative to battery prices undermines the validity of Singer's models because lighting products prices appear to be *more* volatile than batteries prices and thus suggests that the prices of the two product groups do not move together but in fact are affected by different, unobserved factors. *See* Reply Declaration of Catherine Tucker, Ph.D., Exh. T, Dkt. No. 204-4 ¶¶ 81–85 [hereinafter Tucker Reply Decl.].

To be sure, the fact that the prices do not move together according to a visual inspection does not necessarily imply that lighting products and batteries *cannot* be used in a DiD identification strategy. The disjunction merely fails to support that they *can*. The Court must therefore consider other evidence of parallel trends. Tucker provides another such check by plotting the difference between price indices for class batteries and lighting products during the pre-treatment period. *See* Tucker Report ¶¶ 123–125. If the parallel trends assumption held, then one would expect that prices for batteries and lighting products would move together and that the difference between the two sets of prices would be roughly constant. But Tucker's Figure 26 shows that the difference between the prices changed somewhat over time. *See* Tucker Report ¶ 124. Similarly, her Figure 63 shows varying differences between batteries and lighting products prices for the wholesale class in both of Singer's DiD models. *See* Tucker Reply Decl. ¶ 84. Tucker does not explain how to assess whether the changes in differences between the price indices are significant, but the y-axis scale, focusing on tenths of the price indices, is essentially the same scale Singer used for his visual inspections.

United States District Court
Northern District of California

**Figure 26**
**Difference Between Singer Report's Price Indices for Class Batteries and Lighting Products (Walmart Class), Pre-Period**




Tucker Report ¶ 124.

**Figure 63**
**Difference Between Price Indices for Class Batteries and Lighting Products**
**Original and New Singer Difference-in-Differences Models**
**Proposed Wholesale Class**




Tucker Reply Decl. ¶ 84.

The plotted difference between batteries' and lighting products' price indices thus does not support the parallel trends assumption. The Court acknowledges that the parallel trends assumption need not be established statistically. Declaration of Hal J. Singer, Ph.D. in Support of Opposition to Motion to Exclude, Exh. 76, Dkt. No. 202-3 ¶¶ 10, 11 (Apr. 15, 2026). But even if not strictly required, such statistical tests help the Court understand whether the parallel trends assumption is plausible, which Singer agrees is the test for his model's validity. *Id.* ¶ 7.

Even where a visual and statistical inspection of pre-treatment trends fails to support a parallel trends assumption, additional context could establish that the two groups are similar enough for a DiD approach. But the different contexts for batteries and lighting products further undermine the plausibility of comparing batteries to lighting products because they suggest that unobserved variables are not addressed by Singer's approach. First, "disposable batteries account for approximately 15 to 20 percent, and in many instances less, of the cost of Energizer Lighting Products, which renders battery-cost fluctuations unlikely to be a major driver of Lighting-Product cost or price fluctuations." Tucker Report ¶ 98. Second, defendants report that the "primary driver and largest component of the cost to manufacture lighting products is the cost to build the body of the lighting product." Declaration of Jeffrey Stoll, Dkt. No. 182-23 ¶ 3. Energizer's Director of Lighting, Global Marketing, explained that in May 2020, Energizer outsourced the "manufacturing and packaging of lighting products" and that, between May 2020 and December 31, 2025, "the third-party manufacturers did not implement significant price increases to Energizer for the packaged lighting products that they assembled." *Id.* ¶ 4. Energizer's production of lighting products may therefore be meaningfully different from its production of batteries. Unobserved variables that affect the cost of lighting products would not be shared across both lighting products and batteries. And though cost is merely one of multiple variables that affect Energizer's ultimate pricing decisions, if unobserved variables relevant to cost differ between lighting products and batteries, the strength of Singer's DiD approach is undermined.

Finally, different *post*-treatment period events undermine the choice of lighting products as a comparison group. Analysts looking to satisfy the parallel trends assumption typically look at the *pre*-treatment period to confirm that the two groups behave mostly similarly. But, as mentioned

previously, the theory of the DiD research design assumes that, "in the absence of the intervention the mean potential outcomes for the two groups would [have] move[d] in parallel." *See* FJC at 625. The theory thus implies that in the *post*-treatment period the two groups would have moved in parallel except for the effect caused by the treatment studied. But if the comparison group experienced a meaningfully different event in addition to the treatment studied, that could further detract from the validity of the DiD model because it would provide an alternative explanation for the different outcomes in the groups.

Here, Tucker uses the measure of costs from the reports of Singer and the indirect purchaser plaintiffs' expert economic Dr. Kevin Caves to show that the difference in the cost to produce batteries and lighting products decreased during the post-treatment period, suggesting that the cost function for lighting products changed relative to the cost function for batteries. Tucker Report ¶¶ 152–155. Tucker argues that Singer cannot add an explanatory variable to account for costs "because prices do not shift with every movement of costs." *Id.* ¶ 157. Instead, as Tucker notes, most Energizer customers had contractual limitations that would have delayed Energizer's ability to pass through cost increases for at least one to three months from. Tucker Report ¶ 73; Tucker Reply Decl. ¶¶ 59–72. The result, Tucker points out, are implausible statistical results. For example, Singer's new DiD model finds that "when Energizer's costs double, holding other factors constant, its prices decrease by approximately 7.0 percent," which would be very unlikely given "the upward pressure that cost increases exert on prices." Tucker Reply Decl. ¶ 71.

The differences between batteries and lighting products also help explain why Singer's strategy of using Energizer's market power in batteries but not lighting products as the treatment is unpersuasive. As Tucker points out, the possession or lack of market power can affect its bearer's response to exogenous cost increases. As a result, unobserved variables, such as those that might have been relevant during the COVID-19 economic crisis, may have differing effects on class batteries and lighting products in both the pre-September 2019 and post-September 2019 period. Tucker Report ¶ 106. Given that Energizer had market power over batteries and did not have market power over lighting products, that variation may have affected the dependent variable, the price index, but may also have affected the two groups of products differently in either the pre- or

United States District Court
Northern District of California

post-treatment period in ways that the model may not have captured.[2]

In short, Singer has not adequately justified his choice to use lighting products as the comparison group for his DiD analysis. The evidence before the Court fails to justify any assumption that the prices for lighting products and batteries moved in parallel prior to the implementation of the scheme challenged here or that the two products are so similar that their prices would be expected to have moved in parallel.

**2. Before-During Regression**

Singer's report also provides a "before-during" model, which he calls a "robustness test." Such a model could at least theoretically provide evidence of predominance in an antitrust class action, as it did in *Olean*. *See* 31 F.4th at 671. A before-during design analyzes outcomes for a subject that receives a treatment both before and after that treatment and incorporates explanatory variables so as to produce an estimate of the effect that the treatment had on the dependent variable. *See* FJC at 622–23. Singer acknowledges some of the differential strengths of the before-during approach as compared to DiD. *See* Singer Report ¶ 106 & 48–49 n.200. In particular, the "[v]alidity of a pre/post comparison requires that the average outcome for the group that received the treatment would have remained constant in the absence of treatment." FJC at 623.

Defendants note many reasons to suspect that the average outcome for batteries would not have remained constant in the absence of the scheme. For example, zinc, steel, and lithium carbonate are raw materials that make up a significant portion of the cost of Energizer's alkaline batteries. Tucker notes that, after December 2020, input prices for these raw materials increased substantially. Tucker Report ¶ 55. Lithium carbonate prices increased 440 percent from 2021 to 2022. Tucker Report at 41. Figure 9 from the Tucker Report shows the sharp increase in prices for zinc, steel, and copper, which occurred at the end of 2020. Copper prices are relevant because they are an important input into the production of manganese dioxide, which is itself a key input into the production of alkaline batteries. *Id.* ¶ 56.

---

[2] A more persuasive analysis might have chosen a comparison group in a market where Energizer had market power but did not exercise it in an allegedly anticompetitive manner.

United States District Court
Northern District of California

**Figure 9**
**Commodity Prices and MAX AA 8-Pack List Prices from 2019 to 2022**

**Panel A: Zinc, Copper, and Steel Prices, and MAX AA 8-Pack List Prices from June 2019 to June 2022**




**Panel B: Lithium Carbonate Prices from 2019 to 2022**

| | 2019 | 2020 | 2021 | 2022 |
|---|---|---|---|---|
| Price ($ per metric ton) | 12,100 | 8,600 | 12,600 | 68,100 |
| YoY Growth | - | -29% | 47% | 440% |

Tucker also points out that Energizer announced a price increase in batteries in June 2021 that took effect in October 2021. Tucker Report ¶ 58. An internal May 2021 presentation at Energizer reported that most of the increase in price was due to the increase in raw material costs as well as labor and transportation costs. Tucker Report ¶ 60. Tucker tracked additional post-2019 price increases and noted they occur at approximately the same time and are proportional to the increase in the cost of raw materials. *See id.* ¶¶ 61–64.

While these changes may raise questions about the validity of Singer's before-during regression model, the model does attempt to control for variables including costs and

transportation issues such as fuel or supply chain pressure. Singer Report ¶¶ 151–152.[3] Ultimately, defendants' criticisms of Singer's before-during regression model may go to the weight that should properly be accorded to Singer's opinion, rather than to its admissibility or capability of establishing antitrust impact on a classwide basis. *See Olean*, 31 F.4th at 679 ("A lack of persuasiveness is not fatal at certification.").

The problem for plaintiffs, however, is that Singer did not offer his model as a standalone basis for satisfying plaintiffs' burden to prove that antitrust impact can be established across the class. Singer initially described his before-during model as a "robustness test," relegating it to the fourth and final appendix in his class certification report and describing it as "an alternative modeling approach to verify that [his] DiD results are robust to changes in specification." Singer Report ¶ 150. As defendants note, plaintiffs' "motion [for class certification] never mentioned Dr. Singer's before-during model." Defendant Walmart Inc.'s Sur-Reply, Dkt. No. 225, at 6. It was only in plaintiffs' joint reply brief that they argued that Singer's before-during model offers an independent means of showing that the defendants' scheme increased battery prices across the class. *See* Plaintiffs' Joint Reply in Support of Class Certification, Dkt. No. 209-1, at 2, 6. Given that plaintiffs did not offer the before-during model as a standalone method of establishing classwide antitrust impact in their initial motion for class certification, and given that Singer himself did not expressly offer it as sufficient evidence of that impact, plaintiffs cannot rely on it for that purpose with respect to the pending motion for class certification, and the Court must do the same.[4]

* * *

In short, Dr. Singer's difference-in-differences regression analysis is the only standalone

---

[3] Singer acknowledges that a valid before-during approach should control for all potentially confounding, relevant explanatory variables. Singer Report at 48 n.200; *see also* Tucker Report ¶ 157 (noting that given the lag in costs affecting prices, "an approach which simply tried to control for costs in a statistical specification would be flawed because prices do not shift with every movement of costs").

[4] Because the Court declines to consider whether Singer's before-during model provides a standalone basis for certification, it need not conclusively determine on the existing record whether defendants' challenges to that model render it admissible or instead merely involves its persuasiveness.

evidence that the *Portable Power* and *Schuman* plaintiffs have properly offered to show that they can establish antitrust impact on a classwide impact. For the reasons discussed, Singer's analysis fails to do so. Accordingly, the *Portable Power* and *Schuman* plaintiffs have not satisfied their burden, and their motion for class certification is therefore denied. Because it is possible that the *Portable Power* and *Schuman* plaintiffs could satisfy their burden on a different evidentiary record, the denial of plaintiffs' motion is without prejudice to a future motion supported by different evidence.[5]

## III. *Copeland*, No. 23-cv-02087

The plaintiffs in the *Copeland* action, No. 5:23-cv-02087, move to certify a Rule 23(b)(3) class of indirect purchasers of affected batteries, for appointment as class representatives, and for appointment of Cohen Milstein Sellers & Toll PLLC as class counsel. No. 5:23-cv-02087, *Copeland* Plaintiffs' Notice of Motion for Class Certification, Dkt. No. 136-1 [hereinafter IPP Motion].[6] Plaintiffs propose a class consisting of:

> All persons and entities in Repealer Jurisdictions who indirectly purchased Energizer-, Rayovac-, or Eveready-branded disposable household batteries for their own use and not for resale, at any time during the period from September 1, 2019 through November 21, 2025 (the "Class Period"). Household batteries are defined as batteries of cell size AA, AAA, C, D, or 9V.

"Repealer Jurisdictions" are states that have passed state laws permitting indirect purchasers to pursue state antitrust claims notwithstanding the Supreme Court's conclusion that such purchasers lack federal claims. *See Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977).[7]

---

[5] Energizer filed a supplemental opposition to the *Schuman* and *Copeland* plaintiffs' motion for class certification, arguing that both sets of plaintiffs and class members would be subject to arbitration agreements and class waivers. *See* No. 5:23-cv-02093, Dkt. No. 127. Though the Court notes that neither Walmart's attached terms of service nor those of third-party retailers appear to require arbitration of the disputes here, *see, e.g.*, No. 5:23-cv-02093, Dkt. 126-7, at 2, 41, because the Court denies class certification on independent grounds, the Court need not address the grounds advanced in Energizer's supplemental opposition at this time.

[6] The *Copeland* plaintiffs are Don Copeland, Joseph Murray, David Freifeld, Patrick Whitney, Phillip Hague, Denise Foris, Roxann Doriott, Bruce Mims, Lori Ably, Timothy Brown, Peter Costas, and Mike Ballard.

[7] The *Copeland* plaintiffs clarify that, for purposes of their class certification motion, the "Repealer Jurisdictions" are Arizona, California, Connecticut, District of Columbia, Florida,

United States District Court
Northern District of California

**A. The *Copeland* plaintiffs satisfy 23(a).**

**1. Numerosity**

The proposed class is numerous because it would consist of "millions of retail battery purchasers." IPP Motion at 13–14.

**2. Commonality**

The proposed class shares common questions of law and fact, such as whether defendants engaged in conduct forbidden by state antitrust law.

**3. Typicality**

The named plaintiffs are "consumers who purchased Energizer household batteries for personal use at non-Walmart retailers during the class period." IPP Motion at 14. They allege that defendants acted together to inflate the prices that they and absent class members paid for class batteries. Their claims are therefore typical.

**4. Adequacy**

Plaintiffs do not appear to have conflicts of interest with absent class members and promise to "prosecute the action vigorously." IPP Motion at 15.

**B. The *Copeland* plaintiffs have not yet satisfied 23(b)(3).**

Plaintiffs' expert Dr. Kevin W. Caves uses record evidence and an econometric analysis to show that defendants' conduct led to the indirect purchaser plaintiffs suffering an antitrust injury. Class Certification Report of Kevin W. Caves, Ph.D., No. 5:23-cv-02087, Dkt. No. 136-3 (Nov. 21, 2025) [hereinafter Caves Report]. Similarly to Singer, Caves uses a DiD econometric analysis to show that the defendants' conduct "resulted in anticompetitive effects in the form of inflated wholesale and retail prices for disposable household batteries." Caves Report ¶ 139. Like Singer, Caves then goes on to present evidence "that those inflated prices caused class-wide injury that impacted all or nearly all members of the Class." *Id.*

As with Singer's expert report, Caves has not shown that his DiD approach is a valid

Hawai'i, Idaho, Illinois, Iowa, Kansas, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Puerto Rico, Rhode Island, South Carolina, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin.

United States District Court
Northern District of California

method for estimating the effect that defendants' conduct had on class battery prices.

To be certain, the record evidence that Caves marshals does indeed tend to show that Walmart and Energizer sought to curtail price competition over battery prices and were successful in enacting list price increases. *See* Caves Report ¶¶ 115–122. Caves cites emails from 2021 and 2022 wherein Energizer appeared to conclude that retailers were passing on Energizer's price increases on to consumers. Caves Report ¶ 124 & 62 n.255. But, in order to show predominance, plaintiffs must provide a method "capable of answering the question whether there was antitrust impact" *as a result of* the allegedly anticompetitive conduct. *See Olean*, 31 F.4th at 676. Though record evidence can certainly be informative, pointing to list price increases and other measures to maintain price levels is insufficient on its own to satisfy Rule 23(b)(3)'s predominance requirement here because it does not provide a method to identify whether, for example, list prices increased as a result of illegal conduct rather than increases in input costs. *See* Tucker Report ¶¶ 85–86.

Caves provides a DiD regression model that, like Singer's, uses Energizer lighting products (headlamps and lights) as a comparison group. Caves Report ¶¶ 129, 132. Caves justifies the choice of lighting products as a comparison group "because (1) batteries are one of the primary components of headlamps and lighting products, and (2) similar factors impact demand for headlamps, lighting products, and batteries…." Caves Report ¶ 133. Caves' DiD regression model finds that the defendants' allegedly anticompetitive conduct increased prices 11.91 percent relative to lighting products. Caves Report ¶ 137.

Caves's DiD model exhibits many of the same shortcomings as Singer's model, and for the reasons already noted, Caves's model also cannot establish antitrust impact on classwide basis. The Court notes that a visual analysis of nominal and real price indices for batteries and lighting products does not lend itself to the parallel trends assumption, especially because the price indices for the two groups appear to intersect at multiple times. Caves Report at 71–72.

FIGURE 1
NOMINAL HEDONIC PRICE INDEXES FOR DISPOSABLE HOUSEHOLD BATTERIES AND HEADLAMPS & LIGHTING PRODUCTS



United States District Court
Northern District of California

FIGURE 2
REAL HEDONIC PRICE INDEXES FOR DISPOSABLE HOUSEHOLD BATTERIES AND HEADLAMPS & LIGHTING PRODUCTS




*See id.* at 72.

Like Singer, Caves uses a before-during regression model to "test the robustness of the result of my DID model." Caves Report, Appendix A ¶ 1. Caves's regression equation provides a term that "represents additional factors that influence the supply or demand for disposable household batteries." Caves Report, Appendix A ¶ 4. As with Singer's DiD model, there is a serious question as to whether Caves's two-period before-during model adequately accounts for the exogenous raw materials shocks experienced by Energizer in late 2020 and 2021. But in any event, like the *Portable Power* and *Schuman* plaintiffs, the *Copeland* indirect-purchaser plaintiffs failed to adequately invoke Caves's before-during model as an independent method of establishing antitrust impact for purposes of the pending motion. Though their initial motion for class certification did mention Caves's before-during regression, it did so only in a footnote. *See* IPP Motion at 23 n.104. Given both Caves's own description of the model as a "test" of his DiD regression analysis and plaintiffs' relegation of the model to a footnote, defendants did not receive proper notice of plaintiffs' intent to rely upon such a standalone model in support of the pending motion, and the Court therefore will not do so.

* * *

Like the *Portable Power* and *Schuman* plaintiffs, for the purposes of their pending motion

United States District Court
Northern District of California

the *Copeland* indirect-purchaser plaintiffs rely upon their expert's DiD regression analysis to establish that antitrust impact can be established on a classwide basis. That analysis, however, fails to do so. The *Copeland* plaintiffs have therefore failed to satisfy their burden to establish Rule 23(b)(3)'s predominance requirement with competent evidence. Accordingly, the *Copeland* plaintiffs' motion for class certification is also denied. Because it is possible that the *Copeland* plaintiffs could satisfy their burden on a different evidentiary record, the denial of plaintiffs' motion is without prejudice to a future motion supported by different evidence.

**IV. Article III Standing**

Defendants separately argue that certification is improper because plaintiffs' models do not establish injury to every single class member and those uninjured absent class members lack Article III standing. Opposition at 19. But for the purposes of class certification, "only named class members—but not unnamed class members—must demonstrate evidence of standing." *See Healy v. Milliman, Inc.*, 164 F.4th 701, 706 (9th Cir. 2026). The Court therefore need not consider the Article III standing of absent class members at this time.

**V. Defendants' Motion to Exclude Plaintiffs' Experts**

Defendants move to exclude plaintiffs' experts under Federal Rule of Evidence 702 for using invalid control groups in their DiD regression model. Defendants argue that Singer's use of an invalid control or comparison group "render[s] Dr. Singer's DiD analysis unreliable." Motion to Exclude Plaintiffs' Expert Hal Singer, Dkt. No. 182-2, at 9 [hereinafter Singer Motion to Exclude]. Defendants also argue that Singer's before-during regression is flawed in its design and produces unrealistic results. Singer Motion to Exclude at 22. And defendants argue that other choices Caves made, such as using average and not transaction-level data, are not helpful to a factfinder. No. 5:23-cv-02087, Motion to Exclude Expert Testimony and Opinions of Dr. Kevin Caves, Dkt. No. 157-2.

Federal Rule of Evidence 702 provides that an expert witness can provide opinion testimony if the proponent shows the Court that "it is more likely than not that: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c)

United States District Court
Northern District of California

the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case." The Supreme Court's decision in *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993), requires the Court to act as a gatekeeper for expert testimony.

Whether the Court must apply "a 'full' or 'limited' *Daubert* analysis" to plaintiffs' experts' declarations "may depend on the timing of the class certification decision." *Lytle v. Nutramax Labs., Inc.*, 114 F.4th 1011, 1031 (9th Cir. 2024). If discovery has not closed and the "expert's model has yet to be fully developed, a district court is limited at class certification to making a predictive judgment about how likely it is the expert's analysis will eventually bear fruit." *Id.* A district court may certify a class based on an unexecuted damages model that may eventually turn out to be erroneous. *See Noohi*, 146 F.4th at 863–64.

Here, discovery has not yet closed. Though the Court has rejected Singer's and Caves's existing DiD regression models, that holding is limited to the conclusion that those models do not provide "evidence establish[ing] that" the "common question" of antitrust injury "is *capable* of class-wide resolution." *Olean*, 31 F.4th at 666–67. The Court does not, however, conclude that the experts' analyses could never bear fruit. Plaintiffs' economists have chosen generally accepted methods of estimating antitrust injury that could, using different specifications, produce evidence satisfying Rule 23(b)(3). Therefore, the Court denies the defendants' motions to exclude Drs. Singer and Caves without prejudice.

## VI. Motions to Seal

Pursuant to the Court's order setting omnibus sealing procedure in connection with plaintiffs' motions for class certification, Dkt. No. 128, the parties have filed a joint motion to file under seal material filed in connection with the motions for class certification and motions to exclude, Dkt. No. 217.[8]

The parties agree that the compelling-reasons standard applies here because the filings are "more than tangentially related to the merits of a case." *Ctr. for Auto Safety v. Chrysler Grp., LLC*,

---

[8] Again, all docket references, unless otherwise indicated, are to 5:23-cv-02091.

809 F.3d 1092, 1100 (9th Cir. 2016). Under the compelling-reasons standard, a party that seeks to seal a court record "must articulate compelling reasons supported by specific factual findings … that outweigh the general history of access and the public policies favoring disclosure, such as the 'public interest in understanding the judicial process.'" *Kamakana v. City & County of Honolulu*, 447 F.3d 1172, 1178–79 (9th Cir. 2006) (cleaned up). The compelling-reasons standard "sharply tips the balance in favor of production when a document … becomes part of a judicial record." *Id.* at 1180. "Under this stringent standard," the Court must "conscientiously balance the competing interests of the public and the party who seeks to keep certain judicial records secret." *Ctr. for Auto Safety*, 809 F.3d at 1096–97. "Examples" of reasons to seal a court record include when the record "might be used to 'gratify private spite or promote public scandal,' to circulate 'libelous' statements, or 'as sources of business information that might harm a litigant's competitive standing." *Id.* at 1097 (quoting *Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 598–99 (1978)).

The parties seek to seal nearly 200 documents in connection with plaintiffs' motions for class certification. The Court denies the motion to seal as to the briefing on plaintiffs' motions for class certification and defendants' motions to exclude.[9]

The parties justify their motions to seal portions of the relevant briefing on the motions for class certification and motions to exclude on various grounds related to potential harms to the defendants' businesses. The parties cite "Confidential and Strategic Business Information," "Transaction Sales and Purchase Data," "Negotiation and Internal Business Strategy," and "Confidential Terms of Agreements" as satisfying the compelling-reasons standard to seal. The parties argue that the information may be trade secrets or could allow competitors to undercut their pricing. Though "sources of business information that might harm a litigant's competitive standing" can justify sealing under the compelling-reasons standard, *Nixon*, 435 U.S. at 598, such reasons do not justify sealing the briefing here. As the Court has established, the compelling-reasons standard requires *compelling* reasons to seal court records, not merely good cause. The

[9] In the docket for No. 5:23-cv-2087, these documents are Dkt. Nos. 190-17, 191-13, 192-22, 193-21, 193-25, 193-37, 193-39, 194-12, 194-14, 194-16, and 207.

United States District Court
Northern District of California

Ninth Circuit recognizes a "strong presumption in favor of access to court records." *Foltz v. State Farm Mut. Auto. Ins. Co.*, 331 F.3d 1122, 1135 (9th Cir. 2003). The reasons that the parties present for sealing portions of the briefing do not overcome the "strong presumption in favor of access to court records." *Id.* Much of the information does not concern currently sensitive business information but merely details and figures that do not necessarily establish a risk of competitive harm. The information at issue almost entirely involves events occurring multiple years before the filing of this order, such that the information would be of limited use in the present to competitors or negotiating counterparties.

To the extent that the sealed material is discussed in this order, the motion to seal is denied. The parties' motion to seal the remaining exhibits submitted in support of and in opposition to class certification is granted.[10] The interim administrative motions to file under seal are denied as moot given this order's denial of the motions to seal the relevant briefing.

Energizer has also moved to consider whether plaintiffs Portable Power and Micropower Battery's materials should be sealed, Dkt. No. 147, in connection with Energizer's amended answer and counterclaims, Dkt No. 146. Because the answer and counterclaims asserted are central to the merits of Energizer's case, the compelling-reasons standard applies. *See In re Meta Pixel Tax Filing Cases*, 2025 WL 1872974, at *2 (N.D. Cal. May 9, 2025). Because the compelling-reasons standard applies, the Court denies the motion to consider whether another party's materials should be sealed, except to the extent that the materials disclose what appears to be individuals' phone numbers. Thus, the motion to consider whether another party's materials should be sealed is denied except as to pages 25:16, 25:22, 26:10, 26:15, 27:5, 28:2, 28:6, 28:10. The Court also denies as moot Dkt. No. 194.

## CONCLUSION

For the reasons stated above, the Court denies the motions for class certification and denies the motions to exclude plaintiffs' experts Singer and Caves. The parties' sealing motions are denied in part and granted in part. Defendants' motion for leave to file supplemental authority is

[10] This includes the motion at No. 5:23-cv-02087, Dkt. No. 211.

United States District Court
Northern District of California

granted. Dkt. No. 240.

The parties also recently stipulated to extend the stay of discovery until December 2026. Dkt. No. 242. Because the Court has now ruled on plaintiffs' class certification motions, a continued stay of discovery may be unnecessary. The Court therefore declines to enter the proposed stipulation. Instead, the Court sets a further status conference for Thursday, October 22, 2026, at 2:00 p.m. in Courtroom 8 of this Court's San José courthouse. By no later than Thursday, October 15, 2026, the parties in all three cases shall provide the Court with a status conference statement setting forth their positions as to any changes to the existing case schedule that should be made to account for the Court's order on class certification.

**IT IS SO ORDERED.**

Dated: September 28, 2026

P. Casey Pitts
United States District Judge